## APPEAL OF MANVILLE JENCKES CO. (FORMERLY JENCKES SPINNING CO.).

Docket No. 215.    Decided August 6, 1926.

1. Under the facts stated, *held*, that cash received through the issuance of "convertible notes" may be included in invested capital. *Appeal of Middleton Compress & Warehouse Co.*, 1 B. T. A. 1145.

2. In determining the net income of the taxpayer for the fiscal year ended June 30, 1917, subject to the additional normal tax of 4 per cent provided by the Revenue Act of 1917, the excess-profits tax should be credited against the net income for the entire fiscal year, and that proportion of the remainder which the portion of the fiscal year falling in the calendar year 1917 bears to the entire fiscal year should be allocated to the year 1917. *Appeal of F. J. Thompson, Inc.*, 1 B. T. A. 535.

3. The adjustments made by the Commissioner in the taxpayer's invested capital for the six-month period ended December 31, 1917, and the years 1918 and 1919, on account of additional taxes for preceding years, approved. Section 1207, Revenue Act of 1926. See *Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

4. Under the circumstances of this appeal, the taxpayer is entitled to a deduction for the year 1918 of the difference between

the amount of a claim which it had against the Goodyear Tire & Rubber Co., and the amount for which it was settled.

5. In October, 1916, taxpayer entered into a contract with the Firestone Tire & Rubber Co. under which it obligated itself to at once prepare and construct a separate mill in the City of Pawtucket, R. I., for the manufacture of the cotton fabric therein mentioned, and agreed to push its construction and equipment as rapidly as possible with a view to beginning manufacture therein during the month of April or May, 1917, and having it completed for full operation about July 1, 1917. In pursuance of such contract taxpayer ordered or contracted for facilities both prior and subsequent to April 6, 1917, which were acquired and paid for subsequent to that date. *Held*, that the order or contract dates are immaterial, and that, since those facilities were constructed, erected, installed, or acquired on or after April 6, 1917, for the production of articles contributing to the prosecution of the war, they come within the provisions of section 234 (a) (8) of the Revenue Act of 1918.

6. The value in terms of the actual use or employment in the taxpayer's post-war business of certain amortizable facilities determined.

7. In determining the value in use of amortizable facilities, the Board may consider all the facts and conditions relating to the use of those facilities in the taxpayer's business to March 3, 1924.

8. The provisions of section 234 (a) (8) of the Revenue Act of 1921 do not deprive the taxpayer of an allowance for amortization on certain facilities transferred to branch mills for the taxable years 1918 and 1919, although it did not claim such an allowance at the time of filing its returns for the taxable years 1918, 1919, 1920 and 1921, but filed such claim in December, 1922. Section 1209, Revenue Act of 1926.

*Clifford H. Walker, Esq.*, and *James W. Mudge, Esq.*, for the petitioner.

*John D. Foley, Esq.*, and *A. R. Marrs, Esq.*, for the Commissioner.

*Paul Armitage, Esq.*, *G. B. Furman, Esq.*, *William Wallace, Jr., Esq.*, *Arthur A. Ballantine, Esq.*, *Thomas M. Taylor, Esq.*, *James J. Cosgrove, Esq.*, and *S. Milton Simpson, Esq.*, as *amici curiae*.

Before KORNER, MARQUETTE, and MORRIS.

This appeal is from the determination of a deficiency in income and profits taxes for the fiscal year ended June 30, 1917, the six-month period ended December 31, 1917, and the calendar years 1918 and 1919, in the amount of $257,864.70. The taxpayer alleges that the Commissioner erred:

1. In eliminating from invested capital for the fiscal year ended June 30, 1917, certain amounts received by it prior to July 1, 1916, and during the period July 1, 1916, to April 1, 1917, in payment of subscriptions to its preferred stock.

2. In that, in determining the net income of the taxpayer and its subsidiary for the fiscal year ended June 30, 1917, subject to the

additional normal tax of 4 per cent under the Revenue Act of 1917, he credited their respective excess-profits taxes against their respective incomes for the entire fiscal year, instead of against those portions of their incomes for the fiscal year attributable to the six months ending June 30, 1917.

3. In reducing invested capital for the six-month period ended December 31, 1917, on account of additional taxes found to be due for the preceding taxable year.

4. In disallowing as a deduction for the year 1918 a " discount," in the amount of $18,701.01, given to the Goodyear Tire & Rubber Co.

5. In reducing invested capital for the year 1918 on account of additional taxes determined to be due for the fiscal year ended June 30, 1917, and the six-month period ended December 31, 1917.

6. In disallowing, as deductions from gross income for the years 1918 and 1919, certain amounts claimed by the taxpayer as amortization of war-time facilities.

7. In failing to allow depreciation for the years 1918 and 1919 for the property in respect of which amortization was disallowed.

8. In reducing the taxpayer's invested capital for the year 1919, on account of additional taxes determined to be due for the fiscal year ended June 30, 1917, the six-month period ended December 31, 1917, and the calendar year 1918.

### FINDINGS OF FACT.

1. Manville Jenckes Co., the taxpayer herein, formerly named the Jenckes Spinning Co., is, and was during the years 1916 to 1919, inclusive, a Rhode Island corporation with its principal office at Pawtucket. During the years 1916 to 1919, inclusive, the Jenckes Spinning Co. owned the stock of the Tamarack Co., also a Rhode Island corporation, with its principal office at Pawtucket. In the year 1921 the assets and liabilities of the Tamarack Co. were taken over by the Jenckes Spinning Co.

In February, 1918, the Jenckes Spinning Co. acquired the capital stock of the Darlington Warehouse Co., a newly organized corporation, also located in Rhode Island, which it held for the remainder of the year 1918 and for the entire year 1919.

On June 8, 1919, the Jenckes Spinning Co. purchased the capital stock of the Loray Mills, a Maine corporation, with mills at Gastonia, N. C., which it held for the remainder of the year 1919.

Until and including June 30, 1917, the fiscal years of the Jenckes Spinning Co. and the Tamarack Co. ended on June 30 of each year. Thereafter, in 1917, the accounting period was changed to the calendar year and a six-month return was filed for the period July 1, 1917, to December 31, 1917. For the fiscal year ended June 30,

1917, and for the six-month period ended December 31, 1917, separate income-tax returns and consolidated profits-tax returns were filed by the Jenckes Spinning Co. and the Tamarack Co.; for the calendar year 1918 consolidated income and profits-tax returns were filed by the Jenckes Spinning Co., the Tamarack Co., and the Darlington Warehouse Co.; and for the calendar year 1919 consolidated income and profits-tax returns were filed by the Jenckes Spinning Co., the Tamarack Co., the Darlington Warehouse Co., and the Loray Mills (the last-named for the period from June 8, 1919, when it was acquired by the Jenckes Spinning Co.).

From the year 1913 through all the taxable years involved herein the principal business, and from the latter part of 1916 the entire business of the Jenckes Spinning Co. and the Tamarack Co. was the production of fabric for automobile tires, those companies spinning yarn therefor as well as weaving it. From the date of its acquisition by the Jenckes Spinning Co. in 1919, the Loray Mills was entirely engaged in spinning yarn used for tire fabric by the taxpayer's other mills, and from July, 1920, it was also engaged in weaving tire fabric. The Darlington Warehouse Co. was a warehousing concern, used wholly in connection with the tire fabric business.

2. On and prior to July 1, 1916, the Jenckes Spinning Co. needed additional capital for use in its business, for expansion and for reduction of its floating debt. It was therefore decided to issue additional 7 per cent preferred stock in the amount of $750,000. However, as all the preferred stock authorized by the charter of the company had been issued, additional stock could not be legally issued until authority had been obtained from the Rhode Island Legislature, the company having been organized under a special act thereof. The legislature was not to convene until the winter of 1916–1917.

The requirements of the taxpayer's business made it desirable that the additional capital be secured without delay. The company's officers expected that the necessary legislative authority would be obtained when the legislature should meet. They also decided that if, for any reason, such authority could not be obtained, the company would be incorporated in some other State where the necessary authority could be obtained. The company, principally through its treasurer, Jenckes, solicited, at various times in the summer and fall of 1916, and the winter of 1916–1917, subscriptions to such contemplated additional issue of 7 per cent preferred stock in the amount of $750,000 par value. The company expected that the necessary authority for this issue would be obtained and that the stock would be issued during the winter of 1916–1917, and, in any event and at the outside, within two years.

In each case the money was solicited as subscriptions to a new and further issue of preferred stock, which both the person paying the money and the company expected would be issued, but, before the money was accepted, the person paying it was told that, owing to the legislative restriction set forth above, it would be impossible to issue stock until the necessary legislative authority should have been obtained. The persons paying money as subscriptions to the new preferred stock, which was expected to be issued upon receipt of authority from the legislature, were told that they would receive, and they did receive for their money, instruments denominated "Convertible Notes," due July 1, 1918, and bearing interest at the rate of 7 per cent. These convertible notes contained, among other things, the following provision:

The JENCKES SPINNING COMPANY hereby reserves the right and will at some one of said interest dates on or before the maturity hereof to redeem this note by issuing to the holder hereof, shares of preferred stock in said JENCKES SPINNING COMPANY to bear interest at the rate of seven per cent (7%) per annum and said shares to have the same rights and privileges and be subject to the said terms and conditions as the present issue of preferred stock in said JENCKES SPINNING COMPANY, except the time for exercising option or redemption. Said exchange to be made on the basis of One Hundred (100) Dollars, face value of this note for each One Hundred (100) Dollars par value of said preferred stock. And the holder of this note agrees to accept such preferred stock in payment of this note as above provided.

During the times these payments were being solicited and received, the taxpayer was borrowing frequently through note brokers and from banks, in amounts varying from $5,000 to $400,000, generally for periods from four to six months, at interest rates of from 3 to 4½ per cent. On July 1, 1916, its floating debt, represented by notes payable, amounted to $1,325,000. Under the general conditions of the business the borrowings on July 1 of any year were about at the lowest point for the whole year, the cotton carrying requirements then being at the minimum. The borrowings for the fiscal year 1916 had considerably exceeded those of prior years and the need for money appeared to be increasing. Further increase of the floating or temporary debt of 1916 by as much as $750,000 may have been possible, but was not considered by the company's officers to be for the best interests of the company. Up to July 1, 1916, the total payments received by the taxpayer under the subscription agreements referred to amounted to $497,400. Between July 1, 1916, and March 31, 1917, further amounts aggregating $252,600 were received under the subscription agreements, making a total amount of $750,000 so received. The expected authority for the issue of additional preferred stock in the amount of $750,000 was received by the taxpayer from the Legislature of Rhode Island prior to March 31, 1917, and on that date all the "Convertible Notes" referred to were

50144°—27——52

called in and new preferred stock in the amount of $750,000 was issued in exchange therefor.

During the time that the convertible notes were outstanding, the taxpayer entered the par value thereof upon its books of account under the heading " Convertible Notes," but in each and every balance sheet or statement of assets and liabilities made up from such books, whether for submission to its stockholders or to the public, or to the banks or note brokers with whom it had or expected to have credit relations, the amount of the convertible notes was included as a separate item under the general headings " Investment " or " Capital Stock," and the interest payments on such amounts were, in current official statements of income and expense, designated as made on " Convertible Notes," and were listed separately and distinguished from interest payments on " borrowed money," and in the taxpayer's federal income and profits-tax return for that period were not deducted from income.

In its consolidated profits-tax return for the fiscal year ended June 30, 1917, the taxpayer included as part of its invested capital as of July 1, 1916, the amount of $497,400 received prior to July 1, 1916, on account of the stock subscriptions referred to, and it also included as additions to invested capital during the year the various amounts aggregating $252,600, received between July 1, 1916, and April 1, 1917, properly prorated according to the date of receipt.

The Commissioner treated the entire transaction as one in which the effective date of the payments for preferred stock was March 31, 1917, when the convertible notes referred to were exchanged for the actual stock, and included in the taxpayer's invested capital for the fiscal year ended June 30, 1917, only the amount of $750,000 prorated from March 31, 1917, to June 30, 1917.

3. The Commissioner, in determining the net income of the Jenckes Spinning Co. for the fiscal year ended June 30, 1917, subject to the 4 per cent normal tax under the Revenue Act of 1917, credited the amount of excess-profits tax under that Act, as determined by him for that fiscal year, against the net income for the entire fiscal year, before allocating the net income to the periods of the fiscal year falling in the years 1916 and 1917, respectively. The Commissioner used the same method in computing the net income of the Tamarack Co. for the fiscal year ended June 30, 1917, subject to the 4 per cent tax.

4. The Commissioner reduced the consolidated invested capital of the taxpayer and the Tamarack Co. for the six-month period ended December 31, 1917, on account of the income and profits taxes, as computed by him, due and payable in that period, for the fiscal year ended June 30, 1917.

5. On January 1, 1918, the Goodyear Tire & Rubber Co. owed the Jenckes Spinning Co. about $869,000 for goods purchased by and delivered to it prior to that date. The goods were sold on terms of 2 per cent discount for cash, if payment was made on or before the 10th of the month following the date of shipment. If payment was not made until the specified discount period had expired, the purchaser was under a legal obligation to pay the full amount of the bill, and the seller was under no obligation to grant the discount. The total of the account as of January 1, 1918, included unpaid balances of accounts rendered in August and September, 1917, for goods shipped in July and August, 1917, respectively, and the January 1, 1918, account covering shipments made in December, 1917. The discount period on these accounts expired on the 10th day of August, 1917, the 10th day of September, 1917, and the 10th day of January, 1918, respectively. The entire face value of the accounts receivable representing the shipments referred to, without deduction of any part thereof, was included by the Jenckes Spinning Co. in the amount of gross sales stated as Item 3 (a) of its income-tax return for the six-month period ending December 31, 1917. No deduction taken on the return included any amount set up as a reserve for that period against the possible taking of discounts. It was during the entire year 1917, for some years prior thereto, and for some years thereafter, the consistent practice of the Jenckes Spinning Co. to report in its tax return the full amount of the accounts receivable, without deduction of any amount representing discounts which had not actually been taken within the period covered by the return, and to deduct discounts from income only in the taxable period within which such discounts were actually taken and allowed.

In addition to having shipped goods to the Goodyear Tire & Rubber Co. for which payment had not been made, the Jenckes Spinning Co. was carrying between two and three million dollars worth of material which it had purchased to fill orders given by the Goodyear Tire & Rubber Co., and it was in great need of money. The Goodyear Tire & Rubber Co. appears to have been, at the time the goods referred to were shipped, over-extended and also in great need of capital so that it was unable to pay the accounts in question when due. The Jenckes Spinning Co. was not only greatly in need of money, but its officers had doubts as to the future of the Goodyear Tire & Rubber Co., and for these reasons they entered into negotiations with the Goodyear Tire & Rubber Co. with a view to effecting a settlement of the unpaid account. After negotiations extending over a greater part of the months of December, 1917, and January, 1918, the Goodyear Tire & Rubber Co. gave the Jenckes Spinning Co. trade acceptances in the amount of $600,000,

and on January 23, 1918, agreed to pay the remainder of the outstanding accounts on February 9, 1918, and the Jenckes Spinning Co. agreed as a consideration therefor to cancel the following charges appearing on its books against the Goodyear Tire & Rubber Co.:

| | |
|---|---|
| Discount and interest, August account | $4, 180. 31 |
| Discount and interest, September account | 5, 376. 91 |
| Discount and interest, January account | 9, 143. 79 |
| Total | 18, 701. 01 |

The accounts were settled according to the agreement of January 23, 1918, and the Jenckes Spinning Co. in its consolidated return for 1918 deducted from gross income, as a business expense, the amounts of the discounts and interest by which it allowed the Goodyear Tire & Rubber Co. to reduce its indebtedness.

The Commissioner disallowed the deduction in his determination of the consolidated net income of the Jenckes Spinning Co. and its subsidiaries for the calendar year 1918, and held that it was an expense for the six-month period ended December 31, 1917, in which period he allowed the amount in question as a deduction in computing net income.

6. The Commissioner, in computing the taxpayer's consolidated invested capital for the calendar year 1918, made certain reductions therein on account of additional income and profits taxes determined by him to be due from the Jenckes Spinning Co. and the Tamarack Co. for the fiscal year ended June 30, 1917, and the six-month period ended December 31, 1917.

7. The Jenckes Spinning Co. and its subsidiary, the Tamarack Co., on and after April 6, 1917, and before the termination of the World War, constructed, erected, installed, or acquired, certain buildings, machinery, equipment and other facilities. Save for any contrary conclusion which may be properly drawn from the fact that some of these facilities were either ordered or contracted for prior to April 6, 1917, the Commissioner does not dispute the taxpayer's contention that all of these facilities were constructed, erected, installed, or acquired for the production of articles contributing to the prosecution of the war against the German Government. The cost of the facilities mentioned is stipulated by the taxpayer and the Commissioner as follows:

| | |
|---|---|
| For 1917 | $1, 017, 398. 38 |
| For 1918 | 374, 399. 88 |
| For 1919 | 10, 675. 70 |
| Total cost | 1, 402, 473. 96 |
| Depreciation to Jan. 1, 1918 | 61, 137. 40 |
| Depreciated cost Jan. 1, 1918 | 1, 341, 336. 56 |

The depreciated cost is divided as follows:

|  | Jenckes Mill. | Tamarack Mill No. 2. |
|---|---|---|
| Depreciated cost January 1, 1918 | $598, 653. 48 | $742, 683. 08 |
| Less depreciated cost of items sold or discarded | 10, 968. 20 | 6, 658. 99 |
| Balances | 587, 685. 28 | 736, 024. 09 |

On the items sold or discarded, the taxpayer sustained a loss of $15,309.88, divided as follows:

Jenckes Mill _____ $9, 372. 28
Tamarack Mill No. 2 _____ 5, 937. 60

In addition to the aforesaid facilities, the taxpayer, on or after April 6, 1917, and before the termination of the World War, also constructed, erected, installed, or acquired certain other similar facilities, at a cost of $66,703.18, as follows:

1917 _____ $52, 691. 19
1918 _____ 14, 011. 99

These facilities were, subsequent to the termination of the World War, sold and transferred to the taxpayer's branch mills, known as Tamarack No. 1, U. S. Cotton Division, and Loray Mills.

Certain of the aforesaid facilities, the January 1, 1918, depreciated cost of which is $145,760.49, are admitted by the taxpayer and the Commissioner to have been ordered or contracted for prior to April 6, 1917. As to the remainder of the facilities mentioned, the dates of the orders or contracts therefor have not been stipulated or proved. The parties to this appeal have stipulated and agreed, however, subject to the approval of the Board, that if the Board should hold that such of the facilities mentioned as were ordered or contracted for prior to April 6, 1917, are not amortizable, the taxpayer will, before the formal settlement of the amount of the deficiency, if any, to be calculated under the principles laid down by the Board in its decision, be given a reasonable opportunity to obtain and submit to the Commissioner evidence of such dates and the cost of such items; that an agreement thereon shall be reached by the parties to this appeal, if possible, and, if not, that the evidence relating thereto shall be submitted to the Board for a decision as to the amount of amortizable cost of the facilities involved. It is also stipulated by the parties to this appeal that, if the Board holds that the dates of the orders or contracts for the facilities in question are not material, the facilities shall be classed as "facilities constructed, erected, installed, or acquired for the production of articles contributing to the prosecution of the war," and that the allowance for amortization thereof, if any, shall be based on the depreciated values above set forth. The tax-

payer did not claim amortization on the facilities acquired at a cost of $66,703.18 and subsequently transferred to its branch mills, in its original or amended returns for the years 1918 and 1919. The facilities in question, with the exception of those transferred by the taxpayer to its branch mills, as aforesaid, are now, and have been since they were acquired by the taxpayer, located at the Jenckes Mill and Tamarack Mill No. 2.

At the beginning of the war between the United States and Germany, the Jenckes Spinning Co. and its subsidiary, the Tamarack Co., were engaged, except as hereinafter noted, in the production of fabric for automobile tires. This fabric, which was woven from cotton yarns, was at this time chiefly of the kind known as square woven fabric, being used for " fabric " tires. Cord fabric for " cord " tires was not made in large quantities until a later period.

The tire fabric business was first undertaken by the taxpayer about 1911. At that time the taxpayer and its subsidiary, the Tamarack Co., were engaged in the production of cotton yarns and various cotton and silk fabrics of staple character and steady demand, comprising such products as sateens, dress materials, linings, etc. The tire fabric business, from the time of its undertaking, increased rapidly, by 1913 had attained considerable size (2,757,957 pounds), and by 1914 had reached a production of 3,578,410 pounds.

In 1915 the majority stockholders of the Jenckes Spinning Co. decided to devote the entire energies of that company and of the Tamarack Co. to the tire fabric business and to discontinue altogether the manufacture for sale of cotton yarns and of cotton and silk fabrics for dress goods, linings, etc., which it was then conducting and which had earlier been its principal business, and the latter business was discontinued in 1915, except for the running out of contracts taken in 1914 and the manufacture and sale in 1916 and 1917 of materials left on hand when the decision was reached to discontinue lines of business other than tire fabric.

In October, 1916, a contract was obtained by the Tamarack Co. from the Firestone Tire & Rubber Co., of Akron, Ohio, for the supplying of the latter with tire fabric, the principal provisions of which are as follows:

THIS AGREEMENT made and entered into this 10th day of October A. D., 1916, by and between the JENCKES SPINNING COMPANY, a corporation duly incorporated under the laws of the State of Rhode Island, located and doing business in the City of Pawtucket, in the County of Providence, in the State of Rhode Island, party of the first part, and THE FIRESTONE TIRE & RUBBER COMPANY, a corporation duly incorporated under the laws of the State of Ohio and located and doing business in the City of Akron, in the County of Summit, in said State of Ohio, party of the second part, WITNESSETH:

That for and in consideration of the mutual promises and agreements herein contained, it is agreed as follows:

1. The party of the first part agrees to make all necessary provisions for the manufacture of and to manufacture 5,500,000 square yards of 17¼ ounce 84 inches Carded Egyptian cotton fabric 23/11 ply count 23 x 23 annually for a period of five years, and to sell and deliver the same to the party of the second part, as hereinafter provided.

2. The party of the second part agrees that it will purchase from the party of the first part said 5,500,000 square yards annually for said period of five years, and will pay for same at the prices hereinafter fixed, which prices are to be f. o. b. cars Pawtucket, Rhode Island. The party of the first part will at any time the party of the second part so desires prepay the freight on any shipment or shipments of fabric which it may make to the party of the second part and charge the same on its invoice to the party of the second part.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

DELIVERIES: The party of the first part shall make shipments to the party of the second part in equal monthly instalments of approximately 458,000 square yards per month for a period of five years beginning on completion of the plant as hereinafter provided.

3. The party of the first part will at once prepare for and construct a separate mill in the City of Pawtucket, R. I., for the manufacture of the cotton fabric herein mentioned, which mill is to be known as "Tamarack Mill No. 2," and agrees to push its construction and equipment as rapidy as possible with a view to beginning manufacture therein during the month of April or May, 1917, and having it completed for full operation on or about July 1st, 1917.

\*.　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

11. It is the intention of the parties to only construct and equip Tamarack Mill No. 2 so as to produce exclusively for the party of the second part the cotton fabric herein mentioned. In the event, however, that the party of the first part should desire to add to extend the yarn capacity of said mill for the purposes of its trade it may do so at its own expense. In such event, however, the increased production of the yarn can only be resold by the party of the first part at a price not less than cost plus three cents per pound profit.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

14. Concerning Labor: Whereas the party of the first part is causing to be constructed buildings, special machinery, appliances and appurtenances, all particularly with reference to the manufacture of said amount of fabric for the party of the second part, and has carefully calculated its cost as nearly as it is able to in advance, the party of the first part also agrees during each three months period to carefully compile the actual expenditures for labor and to give to the party of the second part, except as herein provided, all the advantages in the way of savings or reduction in labor costs that may accrue through economies, perfection of machines, elimination of lost motion, etc., etc., said savings to be figured in the revision of the billing prices applicable to all shipments of fabric made for such period in which same is effected or accomplished; \* \* \*

The construction of Tamarack Mill No. 2 was begun in October, 1916, but it was not completed until after April 6, 1917, and did not begin production until July 1917.

At the time the Firestone contract was obtained the Jenckes Spinning Co.'s own mills and Tamarack Mill No. 1 were working night and day on tire fabric orders, with a large and growing demand for such products.

Tamarack Mill No. 1 was a spinning mill devoted exclusively to the production of cotton yarn, all of its products being taken by the Jenckes Co. for the weaving of tire fabric for other customers. Both the Jenckes Spinning Co. and Tamarack Mill No. 2 contained substantial spinning facilities and each produced yarn for its own use, besides weaving tire fabric. Prior to 1916 the taxpayer sold some of its production of yarn. Subsequent to 1916, and until June, 1920, the taxpayer sold no yarn, but made purchases of large quantities of yarn which it twisted and wove to fill its orders for tire fabric. The mills of Jenckes Spinning Co. and Tamarack Mill No. 2 had together, and in themselves, both spinning and weaving facilities. These facilities, though not balanced, were largely interdependent in operation. Both mills, however, were, after 1914 and down to the middle of 1920, making large purchases of yarn from outside.

The increase of the tire fabric business of the United States from 1911 down to the beginning of the war between the United States and Germany is indicated by the following available statistics as to the tire manufacturing industry and the automobile industry:

*Production of rubber tires.*

(Figures taken from Biennial U. S. Census Report, 1921, Manufactures, p. 1178, Table 1004.)

|  | 1914. | 1919. |
|---|---|---|
| Autos and trucks, pneumatic casings: | | |
| Number | 8, 021, 371 | 32, 835, 509 |
| Value | $105, 678, 951 | $603, 896, 200 |

*Registration of motor vehicles.*

(Figures are from U. S. Census of Manufactures, 1921, Motor Vehicles, p. 6. No figures before 1913.)

|  | Registration. | Number of cars per 1,000 population. |
|---|---|---|
| 1913 | 1, 268, 062 | 13 |
| 1914 | 1, 711, 339 | 17 |
| 1915 | 2, 445, 664 | 24 |
| 1916 | 3, 512, 996 | 35 |
| 1917 | 4, 983, 340 | 48 |

*Number of automobiles made.*

(Figures are from 14th Census of U. S., 1920, Vol. X, p. 873, Table 13, and 13th Census of U. S., 1910, Vol X, p. 816, Table 18.)

| Class of auto. | 1904. | 1909. | 1914. | 1919. |
|---|---|---|---|---|
| All classes | 21, 692 | 126, 593 | 509, 054 | 1, 683, 916 |
| Passenger cars | 20, 261 | 121, 868 | 543, 679 | 1, 557, 480 |
| Business vehicles | 1, 431 | 4, 725 | 25, 375 | 126, 436 |

*Value of automobiles made.*

(Figures are from 14th Census of U. S., 1920, Vol. X, p. 873, Table 13, and 13th Census of U. S., 1910, Vol. X, p. 816, Table 18.)

| Class of auto. | 904. | 1909. | 1914. | 1919. |
|---|---|---|---|---|
| All classes | $23,751,234 | $164,269,324 | $458,957,843 | $1,443,881,496 |
| Passenger cars | 21,651,331 | 155,821,331 | 413,859,379 | 1,324,458,676 |
| Business vehicles | 2,099,903 | 8,447,993 | 45,098,464 | 230,422,820 |

*Comparative summary automobile industry 1904, 1909, 1914, and 1919.*

(Figures are from 14th Census of U. S., 1920, Vol. X, p. 867, Table 1.)

| | 1904. | 1909. | 1914. | 1919. |
|---|---|---|---|---|
| Number of establishments | 178 | 743 | 1,271 | 2,830 |
| Primary horsepower | 10,109 | 75,550 | 173,684 | 544,242 |
| Capital | $23,083,860 | $173,837,111 | $407,720,915 | $1,780,948,052 |
| Value of products | $30,033,536 | $249,202,075 | $632,831,474 | $3,080,073,979 |
| Value added by manufacturing | $16,882,171 | $117,556,339 | $278,623,544 | $1,139,395,103 |

In June or July, 1917, the taxpayer began the manufacture of tent and tarpaulin duck for the United States Army. Large quantities of such material were manufactured by it during the war period and until March 31, 1919, and were supplied direct to and for the use of the United States Government. Tire fabric production during this period was confined to such as could be produced by the facilities not employed for the production of Army duck. At the time the taxpayer undertook the manufacture of duck for the United States Government, it was not able to keep up with the demand of its regular customers, even with the night and day operations above referred to. It then had large contracts running for several years ahead, in addition to its current demands. The taxpayer was delinquent in its deliveries and accepted orders during the years 1918 and 1919 and the first six months of 1920, in approximately the following amounts:

1918.

|  |  | Pounds. |
|---|---|---|
| Mansfield | | 35,000 |
| U. S. Rubber | | 187,000 |
| Goodyear | | 445,000 |
| | | 667,000 |

1919.

|  |  | |
|---|---|---|
| Goodyear | | 923,000 |
| Firestone | | 333,000 |
| Fisk | | 212,000 |
| Miller | | 129,000 |
| U. S. Rubber | | 305,000 |
| | | 1,902,000 |

1920.

|  | Pounds. |
|---|---|
| Goodyear | 727,000 |
| U. S. Rubber | 508,000 |
| Firestone | 408,000 |
| Miller | 488,000 |
| Fisk | 78,000 |
|  | 2,209,000 |

In addition, the taxpayer declined further orders in approximately the following amounts:

1918.

|  | Pounds. |
|---|---|
| U. S. Rubber | 450,000 |
| Goodyear | 1,500,000 |
| Firestone | 2,743,000 |
|  | 4,693,000 |

1919.

|  |  |
|---|---|
| Fisk | 4,100,000 |
| Goodyear | 500,000 |
|  | 4,600,000 |

1920.

|  |  |
|---|---|
| Goodrich | 1,000,000 |
| Goodyear | 10,000,000 |
| Miller | 500,000 |
|  | 11,500,000 |

The buildings, machinery and equipment, the cost of which the taxpayer seeks to amortize, were constructed, erected, installed, or acquired and paid for after April 6, 1917, and before the termination of the war period, and were used to handle the work carried on by the taxpayer during the war. They consisted of additions or extensions to mill buildings, the completion of Tamarack Mill No. 2, and additional machinery and equipment of the general type and character of the other manufacturing facilities already owned and operated by the taxpayer. They were all located at only two mills, the Jenckes Mill and Tamarack Mill No. 2. The facilities at Tamarack Mill No. 2, upon which amortization is claimed, comprise merely such building construction as was completed and paid for on or after April 6, 1917, and such machinery and equipment as was physically acquired and paid for on or after April 6, 1917.

During the war between the United States and Germany, the taxpayer's purchases of yarn from outside increased.

After March 31, 1919, and until about the first of July, 1920, the taxpayer had a period of great activity. During this period it was

engaged to its utmost in endeavoring to make up its delinquent deliveries on existing orders and in meeting and preparing to meet a very large current demand for tire fabrics and prospective future demands of which certain large customers then gave notice. During this period the outside purchases of yarn continued in even larger amounts than during the war period. A reason for this was the necessity for insuring an adequate supply of yarn to meet the large demand for tire fabric production, due both to the accumulation of back orders postponed or delayed during the war and to a very large current demand by valuable customers whose demands the taxpayer thought it necessary to try to meet for the sake of future business relations. Operation of all available facilities in all plants then owned by the taxpayer continued during this period on the basis of at least 104 hours a week.

The taxpayer, on June 8, 1919, acquired the capital stock of Loray Mills, a Maine corporation, with a plant at Gastonia, N. Car. These mills were then engaged in the production of cotton yarn and the weaving of such yarn into cotton sheetings. Their spinning facilities were to a considerable extent adaptable for the production of cotton yarn suitable for use in tire fabric manufacture and were devoted as soon as possible after their acquisition by the taxpayer, (i. e., beginning with July, 1919), to the production of tire fabric yarn which (until the weaving of tire fabric at Loray began) was all shipped to Pawtucket and used by the taxpayer there in the manufacture of tire fabric.

The looms then at Loray Mills were not suitable for the manufacture of tire fabric. At the time of the purchase of these mills, they were committed to the performance of certain contracts for the making of cotton sheetings, and the looms were devoted to the fulfillment of these contracts until November 20, 1919, when the contracts in question were fulfilled. In February, 1920, the taxpayer began to ship to Loray Mills some 81-inch looms, which were set up and put into operation upon their arrival at Loray Mills and were used there in the production of square woven fabric. During 1921 there were also shipped to Loray Mills some 101-inch looms, which were also employed in weaving tire fabric. The weaving of tire fabric at Loray began in July, 1920.

In April, 1920, one of the largest customers of the taxpayer demanded that the taxpayer add to its facilities for spinning and weaving in order to take care of a large anticipated increase in this customer's demand. The taxpayer thereupon acquired the mills now known as United States Cotton Division, in Pawtucket, R. I. These mills were acquired in April, 1920, and were used exclusively for spinning. Spinning for the taxpayer began there in April, 1920.

For many years prior to 1913 and from that time until July 1, 1920, the taxpayer's mills were operated on a normal basis of 104 hours per week for 52 weeks per year. The 104 hours per week were divided into a day shift of 54 hours and a night shift of 50 hours. The number of night operatives was at all times substantially less than the number of day operatives. During the period January 1, 1916, to June 30, 1920, the ratio of night operatives to day operatives was one to three in the spinning department and one to six in the weaving department. The night operatives were only 70 per cent as efficient as the day operatives.

The taxpayer's operations fall into two general groups, spinning and weaving. Spinning covers all processes from the opening of the bales of cotton through the production of the finished yarn. Except for the final processes of winding the yarn on spools or beams for use in the weaving processes, the last machine in the spinning processes is the spinning frame, which turns out the finished yarn. Weaving covers the remaining processes, resulting in the finished fabric. Except for the final processes of cleaning, inspecting and measuring the fabric, the last machine in the weaving processes is the loom, which turns out the finished fabric.

In each department the machinery and equipment preparatory and accessory to the work done by the spinning frames and the looms, respectively, was kept balanced with the capacity of the spinning frames and the looms, respectively; that is, no more and no less spinning preparatory and accessory machinery was kept on hand than could care for the capacity of the spinning frames, an analagous situation existing with respect to weaving preparatory and accessory machinery. The amount of spinning machinery and equipment on hand at any time as a whole, and its use, could fairly be represented by the number of spinning frames (each spinning frame containing approximately 252 spindles) or by the number of spindles on hand and the use thereof. Similarly, the number of looms or, rather, the total width in inches of all the looms on hand, and their use, could fairly be taken as representative of all the weaving machinery and equipment as a whole and the use thereof. Both the taxpayer and the Government used the number of spindles on hand and the use made thereof as representative of the spinning machinery and equipment and its use; and the total width in inches of all the looms on hand and the use thereof as representative of all the weaving machinery and equipment and its use.

The amortizable facilities, both during and after the war, were not set apart and ear-marked and given separate treatment as to use, but were mingled with the other plant facilities and used without discrimination. It was impracticable to keep, and there were not

kept, records showing separately the amount of use of each item of machinery and equipment. The amortizable facilities comprised a great variety of items used for many manufacturing processes. As a whole, they facilitated both spinning and weaving processes, often in common. The building construction was used for both spinning and weaving operations, both in some instances being conducted on the same floor of the same building, and many functions common to both being provided for therein. Many items of machinery and equipment served both departments and there was a large amount of interdependence between spinning and weaving activities. Save for a few items which were sold or discarded, all of the facilities upon which amortization was claimed remained after the war at the taxpayer's plant and were used to some degree.

The production of taxpayer's mills for the years 1916 to 1924, inclusive, was as follows:

SPINNING

| Year. | Jenckes. | Tamarack No. 1. | Tamarack No. 2. | U. S. Cotton Division. | Loray. | Total. |
|---|---|---|---|---|---|---|
| 1916 | 7,398,475 | 3,429,088 | | | | 10,827,563 |
| 1917 | 7,933,173 | 5,070,329 | [1] 1,853,010 | | | 14,856,512 |
| 1918 | 7,689,175 | 4,283,916 | 5,135,420 | | | 17,108,511 |
| 1919 | 7,199,261 | 5,130,614 | 7,273,820 | | [2] 1,367,739 | 20,971,434 |
| 1920 | 5,310,223 | 3,784,180 | 4,865,586 | [3] 968,466 | 3,990,825 | 18,919,280 |
| 1921 | 3,493,577 | 1,957,099 | 3,729,463 | 1,170,166 | 3,204,344 | 13,554,829 |
| 1922 | 3,406,900 | 2,597,013 | 3,592,222 | [4] 1,349,042 | 8,742,578 | 19,587,755 |
| 1923 | 6,209,653 | 3,649,970 | 6,912,052 | | 8,269,344 | 25,041,019 |
| 1924 | 5,251,385 | [5] 388,526 | 5,887,875 | | 7,982,793 | 19,510,579 |

[1] From July through December.
[2] From June through December.
[3] From April through December.
[4] Mill closed indefinitely in September, 1922.
[5] Mill closed indefinitely in February, 1924.

WEAVING

| Year. | Jenckes. | Tamarack No. 2. | Loray. | Total. |
|---|---|---|---|---|
| 1916 | 11,769,196 | | | 11,769,196 |
| 1917 | 16,352,090 | 1,489,840 | | 17,841,930 |
| 1918 | 16,856,557 | 5,152,719 | | 22,009,276 |
| 1919 | 18,441,345 | 6,650,095 | | 25,091,440 |
| 1920 | 16,685,430 | 6,563,712 | [1] 161,061 | 23,410,203 |
| 1921 | 9,914,928 | 3,512,501 | 930,609 | 14,358,038 |
| 1922 | 8,694,092 | 3,159,238 | 5,437,106 | 17,290,436 |
| 1923 | 10,997,782 | 6,109,350 | 7,267,153 | 24,374,285 |
| 1924 | 10,744,006 | 2,114,321 | 8,523,216 | 21,381,543 |

[1] From July through December.

The effective number of spindles for each year, averaged to place them on an annualized basis, was as follows:

| Year. | Jenckes. | Tamarack No. 1. | Tamarack No. 2. | U. S. Cotton Division. | Loray. | Total. |
|---|---|---|---|---|---|---|
| 1916 | 53,832 | 33,996 | | | | 87,828 |
| 1917 | 59,832 | 33,996 | 23,940 | | | 111,768 |
| 1918 | 59,880 | 33,996 | 47,880 | | | 141,756 |
| 1919 | 59,880 | 33,996 | 49,560 | | 33,311 | 176,747 |
| 1920 | 59,880 | 33,996 | 57,960 | 43,635 | 82,304 | 277,775 |
| 1921 | 59,880 | 33,996 | 57,960 | 58,180 | 107,504 | 317,520 |
| 1922 | 61,555 | 33,996 | 57,960 | 43,635 | 107,504 | 304,651 |
| 1923 | 69,932 | 33,681 | 66,000 | | 117,019 | 286,632 |
| 1924 | 69,932 | 3,777 | 68,680 | | 128,681 | 271,070 |

The effective number of looms for each year, averaged to place them on an annualized basis, was as follows:

| Year. | Mill. | 62″. | 70″. | 81″. | 94″. | 101″. | 108″. | Total. |
|---|---|---|---|---|---|---|---|---|
| 1916 | Jenckes | | 212 | | | | | 212 |
| 1917 | Jenckes | | 262 | 79 | | | 68 | 409 |
| 1918 | Jenckes | | 262 | 79 | 65 | 50 | 114 | 570 |
| | Tamarack No. 2 | | | | 155 | | | 155 |
| 1919 | Jenckes | 92 | 262 | 79 | 100 | 50 | 114 | 697 |
| | Tamarack No. 2 | | | | 186 | | | 186 |
| 1920 | Jenckes | 92 | 262 | 82 | 100 | 50 | 164 | 750 |
| | Tamarack No. 2 | | | | 186 | | | 186 |
| 1921 | Jenckes | 92 | 232 | | 100 | 50 | 164 | 638 |
| | Tamarack No. 2 | | | 38 | 140 | | | 178 |
| | Loray | | | 32 | | | | 32 |
| 1922 | Jenckes | 92 | 196 | | 100 | | 164 | 552 |
| | Tamarack No. 2 | | 24 | 38 | 140 | | | 202 |
| | Loray | | 12 | 32 | | 50 | | 94 |
| 1923 | Jenckes | 92 | 94 | | 100 | | 164 | 450 |
| | Tamarack No. 2 | | 24 | 38 | 140 | | | 202 |
| | Loray | | 144 | 32 | | 50 | | 226 |
| 1924 | Jenckes | 64 | 94 | | 100 | | 148 | 406 |
| | Tamarack No. 2 | | | 22 | 140 | | | 162 |
| | Loray | 28 | 168 | 48 | | 50 | 16 | 310 |

9. A claim for amortization of the facilities involved herein was made by the taxpayer at the time of filing its income and profits-tax returns for the years 1918 and 1919. Claims for amortization were also filed in connection with its amended returns for those years. In the second amended returns the depreciated cost of the facilities, less the cost of items sold or discarded, was given as $1,341,422.33, of which $591,887.57 represented the depreciated cost of facilities at the Jenckes Mill and $749,534.76 the depreciated cost of the facilities at Tamarack Mill No. 2. The taxpayer estimated the post-war value in use of these facilities to be 55 per cent of the depreciated cost. On this basis the taxpayer claimed amortization of said facilities in the amount of $603,640.04. The losses claimed by the taxpayer to have been sustained on the items sold or discarded, aggregating $15,420.21, made the total loss, as computed by the taxpayer, $619,060.25, of which amount $404,040.82 was claimed for the year 1918 and $215,019.43 for the year 1919.

The taxpayer's claim for amortization was examined by an engineer of the Amortization Section of the Bureau of Internal Revenue in June and July, 1922, and a report thereon was made by him under date of November 4, 1922, based upon information obtained by him down to June 1, 1922. The post-war period taken by the engineer as the basis for his conclusion was the period beginning March 3, 1921, and ending May 31, 1922. In his report the engineer found the post-war value in use of the facilities involved herein to be 93.8 per cent and the amortization to be 6.2 per cent of a depreciated cost of $1,359,081.23, and he recommended an amortization allowance of $84,263.04, which was 6.2 per cent of said depreciated cost of $1,359,-081.23. The engineer's report was accepted by the Income Tax Unit without change.

The taxpayer, upon receiving notice that the amortization engineer, in arriving at his determination of post-war value in use, had included in the taxpayer's total production for the period March 3, 1921, to June 1, 1922, the production of the United States Cotton Division and of the Loray Mills and that the Income Tax Unit had accepted the conclusion of the engineer, filed on December 13, 1922, a request for reexamination of its amortization claim and claimed that, in view of the inclusion of the production of the United States Cotton Division and the Loray Mills in the total production of the taxpayer, the equipment transferred to mills other than those in which it was originally installed should also be subjected to amortization. Upon reconsideration of the taxpayer's request of December 13, 1922, the Unit again approved and sustained the report of the engineer. The taxpayer appealed to the Committee on Appeals and Review which, on March 20, 1924, sustained the action of the Unit and denied the appeal. On March 22, 1924, the Commissioner approved the recommendation of the Committee on Appeals and Review and notified the taxpayer thereof. The Commissioner, on the basis of the engineer's report, allocated $55,613.61 of the amortization allowance to the year 1918 and the balance, less $2,446.47 claimed by him to represent depreciation on amortized property to March 1, 1919, to the year 1919. Of the allowance for amortization claimed by the taxpayer, the amount of $348,427.21 was disallowed for the year 1918 and $188,816.47 for the year 1919. These adjustments resulted in restoring to taxpayer's capital, as a total addition to its depreciable assets, the sum of $537,242.68.

The taxpayer did not take any depreciation deduction on its 1918 return on account of any property on which it claimed amortization. The Commissioner did not allow, as a deduction from gross income in 1918, any amount representing depreciation on the amount of asset value restored by him to the taxpayer's capital account on account of amortization disallowed.

10. The Commissioner, upon audit of the taxpayer's return for the year 1919, reduced its invested capital for that year on account of additional income and profits taxes determined by him to be due from the Jenckes Spinning Co. and the Tamarack Co. for the fiscal year ended June 30, 1917, the six-month period ended December 31, 1917, and the calendar year 1918.

### OPINION.

MORRIS: The first question presented by the record in this appeal is what part, if any, of the amount of $750,000 received by the taxpayer prior to March 31, 1917, from the issuance of its "convertible notes," should be included in its invested capital for the fiscal year ended June 30, 1917. The evidence establishes that on and prior to July 1, 1916, the taxpayer needed additional capital and that it was decided by its officers to issue additional preferred stock in the amount of $750,000 as soon as the necessary authority therefor could be obtained from the Legislature of Rhode Island. It was expected that this authority could be obtained at the next session of the legislature, which was to be in the winter of 1916–1917, but, as the additional capital was needed at once, the taxpayer's officers solicited subscriptions to the new issue of preferred stock and issued to the persons subscribing to the same convertible notes due July 1, 1918, bearing interest at the rate of 7 per cent, the taxpayer agreeing to redeem the notes on or before maturity by issuing to the holders thereof 7 per cent preferred stock of a par value equal to the face of the notes, and the holders of the notes agreeing to accept such preferred stock in exchange therefor. Up to July 1, 1916, the taxpayer received on these subscription agreements $497,400, and between July 1, 1916, and March 31, 1917, it received thereon the additional amount of $252,600. The expected authority to issue additional preferred stock was received by the taxpayer prior to March 31, 1917, and on that date all the convertible notes were called in and new preferred stock in the amount of $750,000 was issued therefor.

In its income and profits-tax return for the fiscal year ended June 30, 1917, the taxpayer included as part of its invested capital as of July 1, 1916, the amount of $497,400 received by it on the subscription agreements prior to that date, and it also included as additions to invested capital during the year, the various amounts aggregating $252,600 received between July 1, 1916, and April 1, 1917, properly prorated according to the date of receipt.

The Commissioner treated the entire transaction as one in which the effective date of the payments for the preferred stock was March 31, 1917, when the convertible notes were exchanged for the actual

stock, and included in the taxpayer's invested capital for the fiscal year ended June 30, 1917, only the amount of $750,000, prorated from March 31, 1917, to June 30, 1917.

The situation presented here is practically identical with that found in the *Appeal of Middleton Compress & Warehouse Co.,* 1 B. T. A. 1145. The evidence in that appeal established that some time in the year 1919 the taxpayer, a South Carolina corporation, desired to extend its plant by acquiring a piece of property adjacent thereto which could be purchased for $60,000. Middleton & Co. on November 3, 1919, paid for the taxpayer the purchase price of $60,000, with the understanding that the amount so paid should be considered as a subscription to an additional amount of the taxpayer's capital stock. On November 4, 1919, the directors of the taxpayer agreed to hold a meeting for the purpose of considering an increase of its capital stock, and, on November 5, 1919, at a duly called meeting of the directors, a resolution was adopted authorizing and directing the proper officers to take the necessary steps to procure legal authority to issue additional shares. Such steps as were required by the laws of the State of South Carolina were immediately taken and consummated at the earliest date practicable, and in December, 1919, after having amended its articles of incorporation and thus secured the authority to issue additional stock, certificates of such stock in the amount of $60,000 were duly issued to Middleton & Co. on December 16, 1919. The Board, in holding that the $60,000 paid by Middleton & Co. for the taxpayer should be considered as a part of the taxpayer's invested capital from November 3, 1919, said:

The evidence furnished in this hearing shows conclusively that when, on or about November 3, 1919, the taxpayer planned to increase its plant, and Middleton & Company advanced the funds for the purpose of purchasing the property desired to be acquired, it was understood and agreed by all parties in interest that the funds so advanced should be an addition to the capital of the taxpayer company, and that immediately thereafter the necessary steps were taken which authorized the issuance of additional capital stock. Such steps were carried to completion at the earliest practicable date and, when proper authority to issue additional stock was procured, stock certificates evidencing the payments of $60,000 were duly issued.

The evidence in the instant appeal shows that the money involved herein was actually paid in to the corporation by the several persons as subscriptions for stock which was to be issued as soon as the necessary authority could be obtained. The convertible notes which were issued in the interim were not to be redeemed in cash but were only to be redeemed with the stock when it should be issued. It was intended by all of the parties in interest that the amount of $750,000 paid to the taxpayer under the subscription agreements should be and remain a part of the taxpayer's capital and it was

so carried on the taxpayer's books. We are of the opinion that the decision in the *Appeal of Middleton Compress & Warehouse Co.* is controlling here. It therefore follows that the taxpayer is entitled to include as part of its invested capital, as of July 1, 1917, the amount of $497,400 received prior to that date on account of the stock subscription in question, and to include as additions to invested capital during the fiscal year ended June 30, 1917, the several amounts aggregating $252,600 received between July 1, 1916, and April 1, 1917, prorated according to date received.

The second question presented involves the proper method of determining the net income of the taxpayer and that of its subsidiary for the fiscal year ended June 30, 1917, subject to the additional normal tax of 4 per cent under the Revenue Act of 1917. The taxpayer contends that the amount of the excess profits tax should be credited against that portion of the net income for the fiscal year which the period between January 1, 1917, and the end of the fiscal year bears to the whole of such fiscal year. The Commissioner in his determination used the method which has been approved by this Board in the *Appeal of F. J. Thompson, Inc.*, 1 B. T. A. 535; that is, he credited the excess profits tax of each corporation against its net income for the entire fiscal year, and allocated to the year 1917 that portion of the remainder which the portion of the fiscal year falling in the calendar year 1917 bears to the entire fiscal year. The action of the Commissioner as to this item is approved. See also *Appeal of Bray & Kates Co.*, 3 B. T. A. 1316.

In the third, fifth, and eighth assignments of error, which will be considered together, the taxpayer alleges that the Commissioner erred in reducing its invested capital for the several years involved herein, on account of additional taxes determined to be due for the preceding years. The adjustments in taxpayer's invested capital referred to, and of which the taxpayer complains, were made by the Commissioner in accordance with his long established practice and the regulations in force in respect of the taxable years involved, applicable to the relationship between invested capital of one year and taxes for the preceding year, and are now considered by law as having been correctly made. Section 1207, Revenue Act of 1926. The action of the Commissioner as to these items is therefore approved. *Appeal of Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

The fourth question is whether or not the taxpayer is entitled to deduct, in computing its net income for the year 1918, the amount of $18,701.01, representing " discounts " allowed and interest charges canceled under the circumstances set forth in the findings of fact. Upon consideration of the evidence presented we are of the opinion that the taxpayer's claim that this item should be deducted from

its gross income for the year 1918, instead of from its gross income for the six-month period ended December 31, 1917, as contended by the Commissioner, or that it was not an allowable deduction in any year, as argued at the hearing, is well founded and should be sustained.

The situation, briefly described, was that on January 23, 1918, the Goodyear Tire & Rubber Co. was indebted to the taxpayer in the amount of about $869,000, for goods purchased by and shipped to it prior to January 1, 1918. The amount of the bills for these goods had been entered and accrued on the taxpayer's books, and, the period within which the Goodyear Tire & Rubber Co. was entitled to a discount on these bills having expired, the entire account constituted a valid and subsisting indebtedness of the Goodyear Tire & Rubber Co. to the taxpayer the payment of which it could enforce in full, provided the Goodyear Tire & Rubber Co. had sufficient assets available therefor.

However, on January 23, 1918, there was in the minds of the taxpayer's officers considerable doubt as to the solvency of the Goodyear Tire & Rubber Co., it having been reported to be heavily indebted and to be having difficulty in meeting its obligations; and the taxpayer, being greatly in need of money to meet its own obligations, after extensive negotiations with a view to securing early payment of this account and to avoid the possibility of becoming involved in a receivership or a reorganization of the Goodyear Tire & Rubber Co., agreed, in consideration of a settlement in full by the Goodyear Tire & Rubber Co., not later than February 9, 1918, to remit or deduct from the indebtedness of the Goodyear Tire & Rubber Co. to the taxpayer an amount equal to the accrued interest on the indebtedness and the discount to which the Goodyear Tire & Rubber Co. would have been entitled if it had paid the several bills within the specified discount period. This was not, in our opinion, the giving of a discount such as is ordinarily given in the mercantile business and to which the Goodyear Tire & Rubber Co. would have been entitled if it had paid for the goods referred to on or before the 10th day of the month following the date they were shipped, but is more in the nature of a loss arising from the settlement or compromise of a valid claim which the taxpayer had against the Goodyear Tire & Rubber Co., and which, at the close of the year 1917, had been accrued on its books and had become a part of its capital account. We think the item in question was clearly deductible in computing the taxpayer's net income for the year 1918.

The sixth issue relates to the Commissioner's action in disallowing as deductions from gross income for the years 1918 and 1919 certain amounts claimed by the taxpayer as amortization of war facili-

ties. The taxpayer claimed total amortization deductions of $619,060.25, of which amount $404,040.82 was for the year 1918 and $215,019.43 for the year 1919, in respect of facilities having an alleged depreciated cost at January 1, 1918, of $1,341,422.33. The amount of the total amortization deductions claimed by the taxpayer represented 45 per cent of the depreciated cost of the facilities at January 1, 1918, plus the loss sustained on certain facilities sold or discarded; it being assumed that the value in use of these facilities, in its normal post-war business, was not greater than 55 per cent of their depreciated cost. The Commissioner allowed total amortization deductions of $84,263.04, of which $55,613.61 was allowed for the year 1918 and $28,649.43 for the year 1919, which represented 6.2 per cent of an alleged depreciated cost for amortizable facilities of $1,359,081.23; the Commissioner assuming that the value in use of the amortizable facilities in the taxpayer's stable post-war business was not less than 93.8 per cent of their depreciated cost. Both the taxpayer and the Commissioner have determined the value in use of the facilities in question by a comparison of post-war production with capacity, but their differences arise from their conflicting conceptions as to what constitutes capacity.

The Commissioner presents two additional reasons for his disallowance in part of the amortization claimed by the taxpayer. Three questions, therefore, are presented for our consideration, as follows:

(a) Is the taxpayer entitled, as a matter of statutory right, to a deduction representing a reasonable allowance for amortization in respect of certain facilities actually constructed, erected, installed, or acquired, on or after April 6, 1917, and used subsequent to that date in the production of articles contributing to the prosecution of the war, considering the circumstance that such facilities were ordered or contracted for prior to that date?

(b) In respect of such facilities as may properly be made the subject of an allowance for amortization, how shall their value to the taxpayer in terms of their actual use or employment in the taxpayer's post-war business be determined?

(c) Considering the fact that the taxpayer did not claim an allowance for amortization, at the time of filing its returns for the taxable years 1918, 1919, 1920, and 1921, in respect of certain facilities transferred to branch mills, and that the taxpayer first filed such a claim in December, 1922, do the provisions of section 234 (a) (8) of the Revenue Act of 1921 deprive the taxpayer of an allowance for amortization for the years 1918 and 1919 in respect of those facilities, which it might otherwise have been entitled to under the provisions of the same section of the Revenue Act of 1918?

Save for any conclusion which may be drawn from the fact that some of the facilities were either ordered or contracted for prior to April 6, 1917, the parties have stipulated that the facilities were constructed, erected, installed, or acquired for the production of articles contributing to the prosecution of the war. The effect of this stipulation is that the parties agree that tire fabric is an article contributing to the prosecution of the war, which, in the absence of the stipulation, we are satisfied is the case, leaving the question open whether such facilities as were ordered or contracted for prior to April 6, 1917, were acquired for the production of articles contributing to the prosecution of the war.

This whole controversy arises out of the contractual relations of the taxpayer with the Firestone Tire & Rubber Co. as fixed by the terms of the contract entered into in October, 1916. Under that contract the taxpayer obligated itself to " at once prepare and construct a separate mill in the City of Pawtucket, R. I., for the manufacture of the cotton fabric herein mentioned—and agrees to push its construction and equipment as rapidly as possible with a view to beginning manufacture therein during the month of April or May, 1917, and having it completed for full operation on or about July 1, 1917."

The statute, pertinent in its parts to the question under consideration, reads as follows:

Sec. 234(a). That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*        \*        \*        \*        \*        \*        \*

(8) In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, \* \* \* there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities \* \* \* as has been borne by the taxpayer \* \* \*.

The tests laid down in the foregoing provisions of section 234, which every taxpayer claiming an amortization deduction must meet, are—the facilities must have been constructed, erected, installed, or acquired on or after April 6, 1917, and they must have been constructed, erected, installed, or acquired for the production of articles contributing to the prosecution of the war. These are the only tests prescribed by the statute, and, if met, the taxpayer comes within its provisions. The Commissioner admits that the facilities, in respect of which the taxpayer has made claim for an amortization deduction, were constructed, erected, installed, or acquired, on or after April 6, 1917, and that, so far as it, in this respect, meets the test prescribed by the statute, it is within the realm of section 234(a)(8) and is entitled to the amortization deduction, if the facili-

ties were acquired for the production of articles contributing to the prosecution of the war.

The Commissioner has construed the phrase "*for* the production of articles contributing to the prosecution of the present war," to mean "*for the purpose of* the production of articles contributing to the prosecution of the present war." He contends that unless it was the purpose of the taxpayer, in acquiring the facilities in question, to produce articles contributing to the prosecution of the war, the taxpayer is without the provisions of section 234 and is not entitled to the amortization deduction. He further contends, that the purpose which actuated the taxpayer to make commitments for certain facilities prior to April 6, 1917, was presumptively the taxpayer's purpose in acquiring them after April 6, 1917, and as the war was not then in progress, the facilities were not acquired for the purpose of producing articles contributing to the prosecution thereof, and it appears that he regards this presumption as conclusive.

Admitting, for the sake of argument, the Commissioner's construction of the word "for," we can not agree with his conclusion. Grammatically, "constructed, erected, installed, or acquired" are past participles used adjectively qualifying the words "buildings, machinery, equipment or other facilities" and connoting fully completed acts. If a purpose is necessary, it is the purpose at date of construction, erection, installation, or acquisition, and not that which leads to commitments prior to April 6, 1917. The purpose of the taxpayer in ordering or contracting for facilities may have been entirely different from that which lead to their ultimate acquisition. New conditions may have arisen during the interval between commitment and acquisition which may have entirely changed the purpose as to acquisition of facilities, and especially may this be true when between those dates the Nation became a participant in the World War. Who can say that under such conditions the motive which actuated the taxpayer to make commitments for facilities was presumptively the motive when the facilities were acquired? The inflation in cost of all basic commodities which took place after April 6, 1917, is a matter of common knowledge. In the face of the inflated war costs, the taxpayer might have abandoned temporarily for the period of the war the completion of its plant under costs which might have proved burdensome and prohibitive in carrying on its peace-time business. It chose, however, to proceed with the completion of its plant. If purpose is to be read into the statute, the use to which facilities are intended to be put when acquired and not their intended use when they were contracted for is the factor which must govern. The intended use of the facilities in question acquired by the taxpayer was the production of tire fabric.

This provision of the statute is a relief provision, and, under the well known rules of statutory construction, if there is any doubt concerning its meaning, it must be liberally construed in favor of the taxpayer. Language may not be added or an interpretation made which deprives taxpayers of rights which the wording of the section construed in its ordinary meaning grants. The section does not read " facilities contracted for and constructed, erected, installed, or acquired " after April 6, 1917; it merely provides that the facilities must be constructed, erected, installed or acquired on and after April 6, 1917, for the production of articles contributing to the prosecution of the war. If they were constructed on or after that date, regardless of when contracted for, and the other requirement is met, the section is applicable. As, in our opinion, the order or contract date is immaterial, the facilities were constructed, erected, installed, or acquired for the production of articles contributing to the prosecution of the war, and as all the facilities upon which the taxpayer is claiming amortization were constructed, erected, installed, or acquired on or after April 6, 1917, the taxpayer comes within the provisions of section 234(a) (8).

This conclusion is the interpretation placed by the regulations upon the amortization provisions of the 1918 Act, where it appeared for the first time, an interpretation which has been consistently adhered to by the Bureau under the succeeding Revenue Acts. In our opinion, the regulations properly interpret the law.

Question (b) is of a technical nature, involving an analytical survey of the operations and production of taxpayer's plant facilities over certain periods of time to determine how best to compute the value to the taxpayer, in terms of their actual use or employment in its post-war business, of such facilities as may properly be made the subject of an amortization allowance. The first issue subordinate to this question is: What calendar period is to be regarded as the post-war period? The Commissioner contends that the period March 3, 1921, to March 3, 1924, should be taken as the post-war period, while the taxpayer contends the period should be March 3, 1921, to May 31, 1922.

It will be noted from our findings of fact that taxpayer made claim for amortization of war facilities at the time of filing its returns for the years 1918 and 1919; that this claim was examined by an engineer of the Bureau of Internal Revenue in June and July, 1922, who made a report of his findings as to the value in use of amortizable assets based upon facts pertaining to a post-war period beginning March 3, 1921, and ending May 31, 1922; that the report of this engineer was made the basis for the Commissioner's

determination of the amortization allowance to which the taxpayer was entitled; that in December, 1922, taxpayer requested the Commissioner to reexamine its claim for amortization under the provisions of section 234 (a) (8) of the Revenue Acts of 1918 and 1921; and that such reexamination was made by the Commissioner in January and February, 1923, upon the basis of the same facts as were before him at the time he made his original examination and determination. In support of its contention taxpayer points out that the applicable provisions of the statutes provide for but one reexamination; that such reexamination was based upon facts pertaining to a post-war period ended May 31, 1922; that the Commissioner is without statutory authority now to reexamine the amortization claim and redetermine the tax upon the basis of facts pertaining to any period after May 31, 1922; and that this Board can not test the correctness of the Commissioner's determination by considering evidence which, because of a statutory limitation, the Commissioner not only did not but could not consider. Both agree that the date of March 3, 1921, the date of the President's proclamation declaring the war with the German Government at an end, as the beginning of the post-war period.

Section 234 (a) (8) of the Revenue Act of 1921 provides, *inter alia:*

At any time before March 3, 1924, the Commissioner may, and at the request of the taxpayer shall, reexamine the return, and if he then finds as a result of an appraisal or from other evidence that the deduction originally allowed was incorrect, the income, war-profits, and excess-profits taxes for the year or years affected shall be redetermined. * * *

It will be noted that substantially the same provisions were contained in the Revenue Act of 1918, the only difference being that that Act provided that the reexamination might be made at any time within three years after the termination of the war, while the later Act required that such reexamination be made at any time prior to March 3, 1924. At the time of the passage of the Revenue Act of 1918, the war had not as yet terminated, but had been officially terminated by Executive proclamation before the passage of the Revenue Act of 1921. It would seem clear from the above-quoted provisions of the Revenue Act of 1921 that Congress, by implication at least, has fixed the termination of the post-war period in every case as March 3, 1924, and that it intended that the determination of the amortization deduction should be made in the light of all the conditions and circumstances surrounding a taxpayer's business during the period intervening between the date of the termination of the war and March 3, 1924. Doubtless Congress realized that for the purposes of proper administration of the amortization provisions of

the statute a line would have to be drawn somewhere; and we have no doubt that it intended that the circumstances peculiar to each taxpayer's business during a definitely stated period, a period which would be the same in all cases, should be a determinative factor. It is true that the statute provides that the Commissioner, upon his own motion, may, and at the request of the taxpayer shall, reexamine the return at any time prior to March 3, 1924, and that in a great many cases, as in the case at bar, such reexamination may have been made at a considerable time prior to March 3, 1924; but we see nothing in the statute which would have prohibited a further reexamination by the Commissioner, either upon his own motion or at the request of the taxpayer, before March 3, 1924. Furthermore, we can not concede at all that in our consideration of the appeal we are limited, for the purpose of determining value in use of amortizable facilities, to the facts upon which the Commissioner based his original determination and his subsequent redetermination. It is a matter of common knowledge that the earlier years of the post-war period were years of business depression and the country was not yet back to normalcy. If, perchance, as it so happens in this case, a taxpayer was fortunate enough to have its amortization allowance determined early in the post-war period, when conditions generally indicated a much reduced value in use for amortizable facilities, it would, as a general proposition, unless there was a later review of its case, have secured an allowance in excess of that contemplated by statute. To confine ourselves to a consideration of the facts upon which the Commissioner based his determination, which may have been gathered by an investigation made early in the post-war period, or the facts which may have been available to the Commissioner at the time he made his determination, would inject the element of luck into our determination of the correct deficiency. The statute charges this Board with the duty of determining the correct deficiency in every case that comes before it. To properly discharge this duty we must consider all the facts pertaining to any issue which may enter into such a determination. When we are called upon to determine what constitutes a reasonable deduction for amortization of war facilities, it is our clear duty to make such a determination in the light of all the circumstances and conditions peculiar to each taxpayer's case, and in a manner that will reflect an application of the provisions of the taxing statutes in all cases.

The second issue subordinate to question (b) is: What is a fair basis for the comparison of the capacity of taxpayer's plant facilities with the production available for those facilities during the post-war period? Both the taxpayer and the Commissioner adopt the principle that the value in use of amortizable facilities involves

a consideration of both capacity of facilities and production available for facilities during the post-war period. However, although agreeing as to the fundamental proposition that capacity and production must be considered in some kind of comparison, each works out and applies this comparison in a fundamentally different manner. The taxpayer contends that value in use of amortizable facilities should be determined by, *first*, determining separately the capacity of the pre-war facilities and of the amortizable facilities; *second*, determining the post-war available production; *third*, determining the excess, if any, of the post-war available production over the capacity of the pre-war facilities, such excess representing the post-war use of the amortizable facilities. To state the taxpayer's position in another way, it contends that unless the post-war business is greater than could be accommodated upon its pre-war facilities, it is obtaining no use from its amortizable facilities, and in any event the use which it is obtaining from such facilities is limited to the excess of its post-war production over the capacity of its pre-war facilities. The Commissioner contends that value in use should be determined by, *first*, determining capacity of all facilities at the close of the amortization period, which the Commissioner and the taxpayer agree was January 1, 1919; *second*, determining the post-war available production; *third*, determining the excess or deficiency, if any, of the post-war available production over or under the capacity of all facilities, such excess or deficiency representing the measure of use or non-use, respectively, of all the facilities. The Commissioner distributes the use or non-use, as the case may be, ratably over all of the facilities, amortizable and nonamortizable. The following illustrations will serve to show the application of each of these methods:

EXAMPLE.

Cost of pre-war facilities_____ $100,000
Cost of amortizable facilities_____ 50,000
Capacity of pre-war facilities (units)_____ 100,000
Capacity of amortizable facilities (units)_____ 50,000
Post-war available production_____ 125,000

APPLICATION OF TAXPAYER'S METHOD.

Post-war available production (units)_____ $125,000
Less: Capacity of pre-war facilities (units)_____ $100,000

Post-war available production for amortizable facilities (units)_ $25,000
Percentage that post-war production available for amortizable facilities is of capacity of amortizable facilities_____per cent___ 50
VALUE IN USE of amortizable facilities (50 per cent of $50,000)_____ $25,000

APPLICATION OF COMMISSIONER'S METHOD.

Capacity of pre-war and amortizable facilities (units) _____ $150,000
Post-war available production_____ $125,000
Percentage that post-war available production is of capacity of pre-
   war and amortizable facilities_____per cent__    83.33
VALUE IN USE of amortizable facilities (83.33 per cent of $50,000) ____ $41,665

The above illustration of the application of the Commissioner's method shows clearly what the taxpayer considers to be one of its fundamental errors. Since the post-war available production is less than the total capacity of the pre-war and amortizable facilities, the Commissioner has spread the factor of non-use ratably over the pre-war and amortizable facilities. The method assumes that both pre-war and amortizable facilities are being used to the extent of 83.33 per cent of their normal productive capacity. The Commissioner contends that where the taxpayer, by virtue of a commingling and plant coordinating of pre-war and amortizable facilities, is unable to ascertain by independent investigation the extent to which the amortizable facilities are being used in its stable post-war business, the method adopted by him results in a fair determination. On the other hand, the method adopted by the taxpayer assumes that the amortizable facilities are of no useful value unless the available post-war production exceeds the maximum capacity of the pre-war facilities.

The deduction contemplated by the statute is "a reasonable deduction for the amortization of such part of the cost of such [amortizable] facilities or vessels as has been borne by the taxpayer." The deduction is in respect of specific facilities. The question as to the extent to which such facilities are being used in the taxpayer's stable post-war business is purely one of fact, the proof of which lies essentially with the taxpayer. We realize the difficulties which confront the taxpayer in any attempt to prove the extent to which specific facilities are being used independently of all other facilities, especially where the facilities under investigation have been so commingled and coordinated with the remainder of the plant that their separate functions can not be determined. But when we are confronted with a situation in which the taxpayer is unable to show the extent to which the facilities, in respect of which it is claiming a deduction for amortization, are being used in its stable post-war business, or fails to show that such facilities are being used to any lesser extent in the post-war business than its pre-war facilities, we think it would be an unwarranted assumption for us to assume that the pre-war facilities are being worked to the full extent of their maximum capacity and the amortizable assets only to such extent of their capacity as may be measured by the same percentage that the

excess of post-war available production over the capacity of pre-war facilities is of the capacity of the amortizable facilities. We think it is not so much a question as to the use to which the amortizable facilities might be put if the pre-war facilities were being used to the full extent of their maximum capacity, but rather a question as to the extent to which the amortizable facilities are actually being used in the post-war business, and where this is not ascertainable we think the Commissioner's method reaches a reasonable result.

As previously pointed out, the taxpayer and the Commissioner are in agreement as to the fundamental proposition that capacity and production must be considered in some kind of a comparison in arriving at a determination as to the value in use of amortizable facilities. They disagree as to what is to be regarded as capacity for the purpose of the comparison. The Commissioner contends that the capacity to be used in the comparison is the mean normal capacity, ascertained by averaging production over a series of years, 1916 to 1919. On the other hand, taxpayer asserts that the capacity to be used in the comparison is the maximum output reasonably possible under normal conditions peculiar to its business. For the purposes of the comparison the taxpayer assumes that the maximum production at any time between 1917 and 1919 is fairly representative of the capacity for which it is contending.

One of the most important questions which arises in the determination of capacity in this case is as to the number of hours in the normal or standard working week of the taxpayer, whether it is 54 hours, as the Commissioner determined it to be, or 104 hours, as the taxpayer contends. The evidence in the case shows that the origin of night and day operation long antedated the tire fabric business and had nothing whatever to do with any uncertainty as to the future of that business. The taxpayer's executive head and one of its largest stockholders testified that he became connected with the business in 1896, when his father died and he assumed control of the business himself; that when he became connected with the business the mills were running night and day; that he had often discussed this basis of operation with his father, who advised him that double shift operation was "the best way to operate a mill"; that he recalled that the mill had been operated on a night and day basis prior to the time he assumed control; that they did not operate it night and day merely to rush orders, but such operation was "often" and "our practice"; that when he assumed control in 1910 he retained the same policy of operation just as long as he could possibly sell the production; that he tried to maintain at least 54 hours of day operation and 50 hours of night operation; that he considered the standard which he had set

up as 104 hours per week in the North and somewhat more in the South; that the reason why he did not operate the mills both night and day at times since 1910 was on account of lack of business solely; that up to the early part of 1919 his attitude toward the tire fabric business at Pawtucket was most optimistic; that he had no fear for the immediate future; that up to the close of the war it was not because he thought there might be a loss in the immediate future that he ran double time; that it was not until January or February, 1919, that he became disturbed about the possibility of the loss of business at Pawtucket; that he had followed the future of the automobile and tire industries very closely and had noticed a great many developments in the automobile industry which he thought would increase tire fabric production by leading to greater use of automobiles and consequently greater wear and tear on tires, tending to bring about a greater demand for tire fabric; and that these developments indicated to him "that we were going to have a tremendous business and that it was going to keep on growing and that we had hardly scratched the surface." Other witnesses testified that taxpayer's mills were always known, at least as far back as they could remember, as a "day and night proposition."

The tables contained in the stipulation show that for the period running from the first of 1913 to the middle of 1920 operation on the basis of 104 hours per week or more continued for a total of 345 weeks out of a maximum number of 394 weeks. Even in the early part of this period, from 1913 to 1916, inclusive, out of a maximum number of weeks of 206, operation at the rate of 104 hours per week or more was maintained for 174 weeks. For the remainder of the period, i. e., from 1917 to the middle of 1920, 104-hour week operation was maintained for 171 weeks out of a total of 188, and the remaining 17 weeks were all weeks of 84-hour operation. These admitted facts show that for over seven years, not merely during the period of the war and the active period following the war, but for a substantial number of years before the war and during the early days of the tire fabric industry, night and day operation on the usual basis of 104 hours a week was the ordinary thing. These admitted facts are alone sufficient to establish the 104-hour week as the taxpayer's normal standard. They confirm and corroborate the statement of the witnesses regarding the standard or policy of operation. So firmly was this policy of day and night operation interwoven into the business that, notwithstanding a constantly growing demand for taxpayer's product, particularly since the beginning of tire fabric manufacture, the obtaining of important long-term contracts insuring the future employment of a large part of the plant and the indications afforded by the figures as to the automobile and

tire industries that the demand would continue to grow, every plant addition was planned and its plant capacity estimated on the day and night basis, and the plant had never been increased to a size large enough to handle the estimated future business on anything less than a 104-hour basis. Taking all the testimony together, including that covering the years prior to 1913, there can be no doubt whatever that a long standing and well settled policy had been adopted and maintained, for and in this business, to run the mills day and night and on a standard week of 104 hours.

Coming now to the proposition as to what is to be regarded as the capacity of the facilities at January 1, 1919, the date of termination of the amortization period, it is our opinion that capacity can be arrived at from actual output only by considering the output in years when the mills were running full time and fully organized and equipped. Furthermore, capacity should be capacity as indicated during a year reasonably near to the date as of which capacity is pertinent, because, if operations at a much earlier date are taken, taxpayer does not receive the advantages of improvement in machinery and methods of operation which were presumably present at the date involved. These considerations, it would seem, confine us, in the present case, to a consideration of the output of the years 1916 to 1919. Even in confining our consideration to those years, which are generally regarded as years of maximum production, the taxpayer is placed at a disadvantage at best, due to the fact that during practically all of the time its production was seriously interfered with by abnormal conditions, particularly conditions affecting labor. In the case of this taxpayer, these difficulties were not offset by any particular speeding up during the war period. We believe that it is entirely within reason that the maximum results actually obtained in any one of the years referred to for any one of the taxpayer's mills should be fixed as the measure of the capacity of that mill, and we so decide. On this basis, then, the capacity of the taxpayer's mills should be determined as follows:

SPINNING.

| Mill. | Annualized spindles for year of maximum production. | Maximum production. | Maximum production per spindle. | Number of spindles on annualized basis at Jan. 1, 1919. | Capacity. |
|---|---|---|---|---|---|
| Jenckes | 53,832 | 7,933,173 | 147.37 | 59,880 | 8,824,516 |
| Tamarack No. 1 | 33,996 | 5,070,329 | 149.23 | 33,996 | 5,070,329 |
| Tamarack No. 2 | 49,560 | 7,273,820 | 146.77 | 47,880 | 7,027,348 |
| Total spinning capacity at Jan. 1, 1919 | | | | | 20,922,193 |

WEAVING.

| Mill. | Annualized loom inches for year of maximum production. | Maximum production. | Maximum production per inch. | Total loom inches on annualized basis at Jan. 1, 1919. | Capacity. |
|---|---|---|---|---|---|
| Jenckes | 22, 505 | 11, 769, 196 | 522. 96 | 55, 561 | 29, 056, 181 |
| Tamarack No. 2 | 17, 484 | 6, 650, 095 | 380. 35 | 17, 108 | 6, 507, 028 |
| Total weaving capacity at Jan. 1, 1919 | | | | | 35, 563, 209 |

In comparing post-war production with capacity the Commissioner has included the post-war production of the Loray Mills which were acquired in April, 1919. This the taxpayer contends is improper and can not be supported by any sound theory. All of the taxpayer's mills except Loray were located at or in the vicinity of Pawtucket, R. I. Loray Mills were located at Gastonia, N. Car. The taxpayer had acquired all of the capital stock of the Loray Mills in June, 1919, and throughout the ensuing period to and including 1924 these mills were operated on a day and night basis, while the mills at Pawtucket were operated irregularly. The Loray Mills were engaged in the production of the same sort of goods that were being produced at the mills in Pawtucket, with, for all practical purposes, the same sort of facilities. Taxpayer admits that, when the capital stock of the Loray Mills was acquired in 1919, it was in need of additional spinning facilities; but it denies that this was the determinative factor in the acquisition of those mills. The executive head of the taxpayer testified that he would have purchased Loray even if he had realized at the time that the demand for tire fabric would fall off to such an extent that the plants at Pawtucket could not be fully employed; that he regarded the purchase of Loray Mills at that particular period " as absolutely necessary if we were going to compete and stay in business "; that as between the lower costs of production in the South and his desire for or immediate need of further facilities, the determinative factor in the purchase of Loray was the lower costs; that Loray was acquired primarily to meet competition on open market business; that, after Loray was acquired and was thoroughly organized, his general policy as to the handling of production there was that he sent to Loray the biggest part of the open market sales, for, because of the higher cost of producing the goods at Pawtucket, the taxpayer could not compete for open market business at Pawtucket. He estimated that from 50 to 60 per cent of the total production at Loray could not have been handled at any of the mills at or in the vicinity of Pawtucket at a profit. Thus it would appear that in the acquisition of the Loray Mills the taxpayer had a two-fold purpose, viz: the acquisition of additional facilities for the production of goods, which,

because of the fact that the mills at Pawtucket were already operating to an extent approaching the limits of their capacity, could not be handled at Pawtucket; and the acquisition of facilities for the production of goods which could be produced at a profit in the South but unprofitably in the North. But, in view of the facts that are present in the case, we can not help but express some doubt as to which of these purposes was the dominant one. When the Loray Mills were acquired, the taxpayer, already delinquent in its deliveries, had accepted further orders, and during the years 1918 and 1919 declined further orders in the approximate amounts of 4,693,000 and 4,600,000 pounds, respectively. It is true that during the post-war period, 1921 to 1924, the mills at Pawtucket were operated somewhat irregularly, while the Loray Mills were being operated on the basis of a full 104-hour week, and this corroborates somewhat the testimony of taxpayer's executive head that the largest part of the open market business was sent to Loray to be manufactured under better advantages than obtained at Pawtucket, such as lower labor costs, low labor turnover, and low freight rates on raw material, together with practically equal freight rates on the finished product to the points of delivery. Since the mills at Pawtucket were not being operated during the post-war period up to the full standard of 104 hours per week, it seems only fair and equitable that there should be included in the total post-war production to be compared with capacity, for the purpose of determining value in use, such portion of the production of the Loray Mills as might have been produced at a profit at the Pawtucket Mills, and this we find from the evidence to be 45 per cent of the production at Loray Mills.

We have fixed the capacity of each of the taxpayer's mills on the basis of the maximum results obtained in any one of the years 1916 to 1919. We believe that the available post-war production should be fixed at a figure representing the total of the maximum production of each of the mills in any one of the years of the post-war period; for, after all, this is the full measure of the actual use of the facilities in the taxpayer's post-war business, and if maximum capacity is to be used the comparison should be with maximum production. Therefore, for the purpose of the comparison, we hold the post-war production to have been as follows:

SPINNING.

| Mill (maximum production in any year): | Pounds |
| --- | --- |
| Jenckes | 6, 209, 653 |
| Tamarack No. 1 | 3, 649, 970 |
| Tamarack No. 2 | 6, 912, 052 |
| U. S. Cotton Division | 1, 170, 166 |
| Loray (45 per cent of 8,742,578) | 3, 934, 160 |
| Total post-war production | 21, 876, 001 |

WEAVING.

| Mill (maximum production in any year): | Pounds |
|---|---|
| Jenckes | 10, 997, 782 |
| Tamarack No. 2 | 6, 109, 350 |
| Loray (45 per cent of 7,267,153) | 3, 270, 219 |
| Total post-war production | 20, 377, 351 |

The capacity and the post-war production having been determined as above outlined, we determine the value in use of the amortizable facilities to be as follows:

SPINNING.

| | |
|---|---|
| Capacity of spinning facilities Jan. 1, 1919 _____ pounds __ | 20, 922, 193 |
| Post-war production of spinning facilities _____ do ____ | 21, 876, 001 |
| VALUE IN USE of spinning facilities _____ per cent __ | 100 |

WEAVING.

| | |
|---|---|
| Capacity of weaving facilities Jan. 1, 1919 _____ pounds __ | 35, 563, 209 |
| Post-war production of weaving facilities _____ do ____ | 20, 377, 351 |
| VALUE IN USE of weaving facilities (percentage that post-war production is of capacity) _____ per cent __ | 57. 30 |
| VALUE IN USE of spinning and weaving facilities _____ do __ | 78. 65 |

This leaves for consideration the last question under the sixth issue—considering the fact that the taxpayer did not claim an allowance for amortization, at the time of filing its returns for the taxable years 1918, 1919, 1920 and 1921, in respect of certain facilities transferred to branch mills, and that such a claim was first filed in December, 1922, do the provisions of section 234 (a) (8) of the Revenue Act of 1921 deprive the taxpayer of an allowance for amortization, for the taxable years 1918 and 1919, in respect of those facilities, which it might otherwise have been entitled to under the provisions of the same section of the Revenue Act of 1918? The Commissioner contends that, under the circumstances outlined in the question, section 234 (a) (8) of the Revenue Act of 1921 bars the allowance of an amortization deduction in respect of the facilities referred to. As pointed out in our findings of fact, the facilities here referred to are certain facilities acquired by the taxpayer at a cost of $66,703.18, which, after the termination of the amortization period, it transferred and sold to branch or subsidiary mills. The section of the statute upon which the Commissioner relies as authority for his action, so far as it is pertinent to the question under consideration, provides as follows:

SEC. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*      \*      \*      \*      \*      \*      \*

(8) In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired on or after April 6, 1917, for the pro-

duction of articles contributing to the prosecution of the war against the German Government, * * * there shall be allowed, for any taxable year ending before March 3, 1924 (*if claim therefor was made at the time of filing return for the taxable year 1918, 1919, 1920, or 1921*) a reasonable deduction for the amortization of such part of the cost of such facilities or vessels as has been borne by the taxpayer, * * *.    (Italics ours.)

The Commissioner has construed the italicized parenthetical clause to mean that no amortization deduction can be allowed in respect of any or all of the years enumerated therein unless claim for such deduction was made at the time of filing the return for the year or years affected. The taxpayer contends that this provision of the statute relates entirely to returns filed under the Revenue Act of 1921, and can not be applied retroactively to years the returns for which were filed under the Revenue Act of 1918. It seems unnecessary to enter into any discussion of the relative merits of the respective contentions of the parties, since, in our opinion, the question is disposed of by the provisions of section 1209 of the Revenue Act of 1926, which are as follows:

The deduction provided by paragraph (9) of subdivision (a) of section 214 or by paragraph (8) of subdivision (a) of section 234 of the Revenue Act of 1918 may (notwithstanding any provisions of the Revenue Act of 1921) be allowed for the taxable year 1918, 1919, or 1920 if claim therefor was made before June 15, 1924.

Claim for an amortization deduction in respect of the facilities in question was filed by the taxpayer in December, 1922; hence, the question must be resolved in favor of the taxpayer.

The seventh assignment of errors concerns the Commissioner's failure, in computing taxable net income for each of the years under consideration, to allow a reasonable deduction for depreciation in respect of the costs of those assets which the Commissioner has held are not amortizable. The parties have stipulated as follows:

In revised schedule 23, deficiency letter of July 22, 1924, and schedule 23 of audit letter of April 4, 1924, the Commissioner disallowed as a deduction from gross income in 1918 an amount of $348,427.21, representing amortization of war facilities claimed by the taxpayer. The taxpayer did not take any depreciation deduction in its 1918 return on account of any property on which it claimed amortization.

In revised schedule 28, audit letter of July 22nd, and schedule 28 of letter dated April 4, 1924, the Commissioner disallowed as a deduction from gross income an amount of $188,816.47, representing amortization of war facilities claimed by the taxpayer.

The above adjustments result in restoring to capital, as a total addition to depreciable assets, the sum of $537,243.68.

The Commissioner did not allow as a deduction from gross income in 1918 any amount representing depreciation on the foregoing amount of asset value restored by him to the capital account.

Though this seventh assignment of error is applicable under the pleadings to both the years 1918 and 1919, the stipulation set out above is limited by its terms to the year 1918. The record is entirely silent as to what the Commissioner's action in this respect may have been for the year 1919. The taxpayer is entitled under the statute to a deduction representing a reasonable allowance for depreciation of all of its physical assets which are not the proper subject of an amortization allowance; and the Commissioner's computation of net income, for both years, is in error, to the extent that he has failed to include such a deduction.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*

SMITH dissents on the second point.

ARUNDELL and MILLIKEN did not participate.