## APPEAL OF STANDARD REFRACTORIES CO.

Docket Nos. 3617, 3618.    Promulgated February 3, 1927.

1. Under section 234 (a) (8) of the Revenue Act of 1918, a taxpayer is entitled to a deduction for amortization on facilities acquired on or after April 6, 1917, for the production of articles contributing to the prosecution of the war, notwithstanding some or all of such facilities may have been contracted for prior to that date or may have been acquired pursuant to a plan of expansion determined upon and entered into prior to that date. *Appeal of Manville Jenckes Co.*, 4 B. T. A. 765.

2. In determining the deduction to which the taxpayer is entitled on amortizable facilities which were continued in use in its postwar business, the evidence of the extent to which such facilities were used by another corporation after it acquired the taxpayer's capital stock and assets is of little value.

3. The value in use in a taxpayer's normal postwar business of amortizable facilities may not be measured or determined solely on the basis of the physical use of such facilities by it during the postwar period.

4. Supplies were purchased and their cost was charged to expense in prior years; the taxpayer, at the beginning of the taxable year, included in inventory the cost of supplies then on hand to conform to a new accounting practice under which supplies were to be included in inventory when purchased and written off to expense only as and when they were used. *Held,* that the cost of supplies included in inventory account did not constitute income for the taxable year.

*C. J. McGuire, Esq.,* and *James O. Wynn, Jr., Esq.,* for the petitioner.

*A. R. Marrs, Esq.,* for the Commissioner.

In this appeal the petitioner seeks a redetermination of its income and profits taxes for the years 1918 and 1919, for which the Commissioner has determined deficiencies in the amounts of $104,516.78 and $539.44, respectively. Separate appeals were filed for each of the years, but at the hearing they were consolidated by agreement of counsel. Two errors are alleged in the petition: first, the disallowance by the Commissioner of a deduction, in the sum of $128,566.22, claimed by the petitioner in its return for the year 1918 as amortization of war facilities; and, second, the action of the Commissioner in refusing to reduce net income by an amount equal to a portion of a credit to surplus which appeared upon the petitioner's books for that year and which arose out of an adjustment in the. inventory accounts.

### FINDINGS OF FACT.

The Standard Refractories Co., the petitioner herein, is a Pennsylvania corporation with its principal office at Philadelphia. It was organized in 1913, and immediately thereafter engaged in the manufacture of silica fire brick and continued to be so engaged through the taxable years in question and down to and including a portion of the year 1922.

Silica bricks are composed of ganister rock or quartzite to which in the process of manufacture there has been added about 2 per cent of lime. One of the principal characteristics of this kind of brick is the ability to resist high temperatures, and it is because of this

that they are used extensively in the building of open-hearth furnaces used in the molding and refining of steel and in the construction of furnaces used in the molding and refining of copper. In these refining processes temperatures of 3,000° Fahrenheit are not unusual, and this intense heat, coupled with the destructive action of slag, tends to melt, break down, and destroy these silica brick so used as lining for furnaces, and it is necessary from time to time to repair the linings or reconstruct them completely. Silica brick is the only material which can be economically and efficiently used for lining such furnaces and is almost indispensable in the refining of steel and copper, which two processes absorb approximately 85 per cent of the total production.

When the petitioner commenced operations in 1913, its plant, situated at Claysburg, Pa., was composed of four kilns with the necessary supplementary equipment. From its inception the company had a definite policy of expansion which contemplated an ultimate maximum production of 50,000 bricks per day. As the business grew and developed it became apparent that the contemplated enlargement of the plant, pursuant to this policy, would be, in the years to come, wholly inadequate to meet the demands, and prior to April 6, 1917, its policy of expansion had been revised so that it contemplated a plant with a maximum production of 100,000 bricks per day. Subsequent to April 6, 1917, and as the result of the growth of its business during the war period, which for the purposes of this case may be said to have terminated on December 31, 1918, there was a further modification of the plans for plant expansion with a view to reaching ultimately a maximum production of 140,000 per day.

The petitioner's business grew steadily and, pursuant to the plan of expansion, additional kilns were constructed from time to time so that by April 6, 1917, it had 14 completed kilns and 4 additional kilns under construction. After April 6, 1917, and prior to December 31, 1918, the 4 kilns under construction were completed and 2 additional kilns were constructed. During the same period work was done on the other kilns; certain construction work was done on office buildings; extensions were made to stock sheds; the drying tunnels were extended; additional machinery was installed in the plant; additions were made to quarry equipment, including tracks, cars, etc.; and a number of dwellings were erected for the use of laborers employed at the plant. Some of these additional facilities so constructed, erected, installed, or acquired, during the war period, were supplemental to and necessary for the efficient operation of the facilities constructed, erected, installed, or acquired prior to April 6, 1917. The operation of the petitioner's plant as it stood on April 6, 1917,

required the employment of more laborers than could be accommodated by the housing facilities then available in the vicinity of the plant.

Immediately after this country became an active participant in the World War, the demand for silica brick increased with great rapidity and soon surpassed any demand which the industry had ever experienced. The abnormal demands for steel and steel products necessitated the continuance of operation of smelting and refining furnaces without the usual and customary intermissions for repairs and replacements. Because of this condition the silica brick linings of the furnaces were destroyed within comparatively brief intervals, with the result that replacements were required much more frequently than they would have been under normal operating conditions. Representatives of the Government from various departments and bureaus which were interested in the production of war materials frequently visited the petitioner's plant in an effort to induce its officers to increase the production to the maximum capacity of the plant. During the war period approximately 85 per cent of the petitioner's production was consumed by producers of steel, steel products, and other similar war materials, and an additional 10 per cent thereof was consumed by producers of copper and copper products. Shipments of silica bricks were made under Class A–1 priority certificates issued by the War Industries Board, and the petitioner, having been classified as an essential war industry, received shipments of fuel under that class of priority certificates.

At the time of the signing of the Armistice the petitioner had on hand orders and contracts for a large number of silica brick. Almost immediately after that date the purchasers began to send in suspension orders and cancellations. Later practically all of the suspended orders were superseded by cancellations. In many instances the production of the brick necessary for the filling of these orders and contracts had been started, and as a matter of economy the manufacture of these brick was completed, since it was cheaper to complete them than it was to discontinue manufacturing and break them up in order to salvage the raw materials.

During the course of the hearing the parties entered into a stipulation as follows:

The Standard Refractories Company prior to and on and after April 6, 1917, and before December 31, 1918, constructed, erected, acquired certain buildings, machinery, equipment, and additions to plant and equipment and other facilities. Some of these facilities, for example, the four kilns, were in process of construction on April 6th, 1917. Other facilities may have been ordered or contracted for or authorized or contemplated prior to April 6th, 1917. Save for any legal argument to be drawn from such facts in the case of some of these facilities it is admitted and agreed that the schedule here-

with submitted by counsel for the taxpayer gives the accurate costs of the facilities claimed by the taxpayer to be amortizable, except perhaps in one respect, to wit, that the book entries from which said costs are determined may or may not have been made until after the acquisition of the facilities, so that the dates of certain book entries may or may not be conclusive of the dates of construction, erection, installation or acquisition.

If the Board should sustain the Government's legal contention in whole or in part, then it is agreed, subject to the approval of the Board, that to the extent rendered necessary by the Board's opinion, and before the final settlement of the amount of deficiency, if any, to be calculated under the principle laid down by the Board in its decision, the taxpayer shall have a reasonable opportunity to obtain and submit to the Government evidence of the contract or order dates, segregation of all costs of additions in process of construction on April 6th, 1917, and such other evidence as books, essential under the decision of the Board; that an agreement thereon shall be reached by the parties, if possible, and if not that the evidence relating thereto be submitted to the Board in accordance with Rule 50 for a decision thereon, as to the correct amount of amortizable costs in connection with a settlement of the amount of such deficiency.

In determining such deficiency under Rule 50, due effect must be given to depreciation already allowed by the Treasury Department for the years 1917 and 1918.

The schedule of costs referred to in the foregoing stipulation contains 123 items relating to buildings, machinery, equipment, etc. These various costs have been divided into three groups in accordance with their dates of entry on the petitioner's books. In the first group have been placed those costs incurred prior to April 6, 1917; in the second group those incurred between April 6, 1917, and December 31 of that year; and in the third group those incurred during the calendar year 1918. The aggregate amounts contained in each of these groups and the depreciation deductions for the year 1917 with respect to the facilities acquired after April 6, 1917, are as follows:

| | |
|---|---|
| Costs to April 6, 1917, as shown by dates of book entries | $415, 059. 60 |
| Costs from April 6 to December 31, 1917 according to dates of book entries | 236, 751. 55 |
| Costs during the year 1918, according to dates of book entries | 257, 044. 13 |
| Total costs to December 31, 1918 | 908, 855. 28 |
| Depreciation deducted for the year 1917, in respect of facilities acquired during the period April 6 to December 31, 1917 | 14, 230. 20 |

The entire cost of the facilities constructed, erected, installed, or acquired on or after April 6, 1917, was borne by the petitioner.

In the silica brick industry the kiln, with its complementary machinery and equipment, may be taken as a fair unit of measurement when determining the capacity of any particular plant. In

the construction, erection, installation, or acquisition of additional facilities both before and after April 6, 1917, the petitioner endeavored to maintain the usual and efficient ratio of kilns to machinery and equipment. During the war period the molding department was operated on the basis of three shifts in each twenty-four hours, and the other departments of the plant were operated on a night and day basis. Measured by the average production during the war period, the petitioner's plant as it stood on April 6, 1917, was capable of producing 100,000 bricks per day. The postwar demand for silica brick could have been supplied by the plant and equipment as it stood on April 6, 1917. The postwar production has at all times been greater than prewar production. The production of the molding department and of finished burnt brick from January 1, 1916, to August 31, 1922, was as follows:

*Molding department.*

| Month. | 1916. | 1917. | 1918. | 1919. | 1920. | 1921. | 1922. |
|---|---|---|---|---|---|---|---|
| January | 934,570 | 2,442,680 | 2,064,837 | 1,616,359 | 1,642,666 | 1,159,626 | 895,637 |
| February | 990,000 | 2,234,226 | 2,205,619 | 1,246,707 | 1,460,592 | 1,254,476 | 900,420 |
| March | 1,240,856 | 2,670,502 | 2,593,855 | 1,564,037 | 1,879,573 | 1,074,065 | 923,735 |
| April | 1,166,937 | 2,576,213 | 2,286,109 | 1,374,999 | 2,110,638 | 288,044 | 1,126,722 |
| May | 1,392,263 | 2,896,293 | 2,424,154 | 971,554 | 1,893,962 | 506,689 | 1,573,719 |
| June | 1,332,567 | 2,740,201 | 2,418,475 | 1,199,203 | 1,716,643 | 644,668 | 1,634,651 |
| July | 1,358,480 | 2,587,150 | 2,550,931 | 1,207,188 | 1,690,425 | 370,720 | 1,719,503 |
| August | 1,576,807 | 2,702,194 | 2,281,284 | 1,614,151 | 1,767,064 | 400,389 | 1,554,930 |
| September | 1,527,493 | 2,781,807 | 2,247,801 | 1,615,151 | 1,646,706 | 747,226 | 1,955,399 |
| October | 1,826,756 | 3,008,116 | 2,459,583 | 1,788,370 | 1,702,547 | 602,666 | 1,969,539 |
| November | 1,911,845 | 2,913,770 | 1,885,832 | 1,389,142 | 1,946,913 | 749,091 | |
| December | 2,046,226 | 2,373,138 | 1,631,058 | 1,242,263 | 1,487,234 | 498,766 | |
| Total | 17,304,800 | 31,866,380 | 26,849,538 | 16,829,124 | 20,914,963 | 8,296,426 | 14,251,255 |
| Average | 1,442,067 | 2,655,532 | 2,237,462 | 1,402,427 | 1,745,414 | 691,369 | 1,425,426 |

*Finished burnt brick.*

| Month. | 1916. | 1917. | 1918. | 1919. | 1920 | 1921. | 1922. |
|---|---|---|---|---|---|---|---|
| January | 870,328 | 1,730,833 | 1,687,870 | 1,232,447 | 1,315,661 | 1,044,800 | 572,496 |
| February | 880,314 | 1,565,935 | 1,712,896 | 1,363,122 | 1,332,921 | 966,406 | 870,872 |
| March | 870,164 | 2,029,880 | 2,004,052 | 1,285,461 | 1,491,489 | 625,623 | 764,785 |
| April | 1,087,884 | 2,113,687 | 2,142,489 | 1,184,514 | 1,740,328 | 504,029 | 855,841 |
| May | 1,124,172 | 2,430,905 | 1,785,615 | 903,331 | 1,663,348 | 693,699 | 1,244,788 |
| June | 1,075,686 | 2,277,252 | 2,175,432 | 770,762 | 1,622,770 | 476,534 | 849,183 |
| July | 1,127,404 | 2,093,273 | 2,398,657 | 888,842 | 1,402,037 | 510,153 | 1,051,942 |
| August | 1,201,470 | 2,234,184 | 1,788,505 | 1,209,082 | 1,616,638 | 617,798 | 1,354,990 |
| September | 1,212,030 | 2,084,227 | 1,697,310 | 1,490,977 | 1,452,404 | 450,743 | |
| October | 1,646,756 | 2,560,379 | 2,264,707 | 1,068,473 | 1,738,963 | 588,977 | |
| November | 1,546,737 | 2,325,271 | 1,764,501 | 1,095,614 | 1,846,657 | 343,331 | |
| December | 1,596,175 | 2,601,332 | 1,931,673 | 1,427,739 | 1,606,575 | 637,378 | |
| Total | 14,239,120 | 26,047,158 | 23,353,707 | 13,920,364 | 18,837,791 | 7,458,871 | 7,564,897 |
| Average | 1,186,593 | 2,170,597 | 1,946,142 | 1,160,030 | 1,569,816 | 621,573 | 945,612 |

The petitioner's business was the only industry in the vicinity of Claysburg. Under the stimulus of the war-time demand for its product, the petitioner greatly increased the number of its employees, with the result that during the war period the population of Claysburg increased from approximately 250 to approximately

1,200. At one time during the war period the company had on its pay roll between 840 and 850 employees. On April 6, 1917, the housing facilities in Claysburg were inadequate and many of the employees lived in houses described as "shanties" and in tents. After that the shortage in housing facilities became more acute and the company found it necessary to construct numerous cottages and tenement houses. A part of this construction was intended to remedy the shortage existing on or before April 6, 1917. After the war the petitioner made considerable reductions in the number of its employees, and as a result was able to rent only a few of the houses and tenements. Several of the cottages were offered for sale at prices as low as $100 but no purchasers could be found.

During the month of October, 1922, all of the stock of the Standard Refractories Co. was acquired by a Pennsylvania corporation known as the General Refractories Co., and on or about November 1, 1922, the General Refractories Co. took over all of the assets and business of the petitioner and later caused the company to be dissolved. The General Refractories Co. owned and operated numerous plants. Shortly after its acquisition of the petitioner's plant and equipment, it transferred a considerable part of its manufacturing activities to the Claysburg plant, and while this plant at no time prior to the close of the year 1924 was operated at its maximum capacity, it was at all times after November 1, 1922, operated at a much higher rate of production than it had been during the time of its ownership by the petitioner company.

In its return for the year 1918 the petitioner claimed as a deduction from gross income the sum of $128,566.22 on account of amortization of facilities constructed, erected, installed, or acquired on or after April 6, 1917. The Commissioner disallowed the entire amount of the deduction claimed, and the deficiency for the year 1918 results from such disallowance.

During the years 1913 to 1918, inclusive, it had been the petitioner's accounting practice to charge all purchases of parts and materials for the repair of plant equipment to expense for the year in which the purchases were made. In 1919 this practice was discontinued and thereafter such purchases were charged to miscellaneous stores' accounts and entered into and became a part of the petitioner's inventory accounts, and charges to expense were made only when and as the spare parts and materials were withdrawn from stores for actual use. In order to make the accounting records conform to the new accounting practice, an inventory of spare parts and materials was taken on January 31, 1919, and by journal entries as of that date the cost thereof, then computed to be $13,464.46 (later adjusted to $10,576.74), was set up on its books by sundry charges

to miscellaneous stores' accounts and a credit to surplus. The parts and materials thus inventoried had been acquired from time to time during the entire period of the company's existence.

In its return for the year 1919 the petitioner included the sum of $10,576.74 in gross income, with the notation that at least $5,000 of this amount should be exempt from tax for the reason that the minimum cost of the spare parts on hand at any time during the preceding four years was in excess of the amount of the exemption claimed. The Commissioner determined that the entire amount was taxable income for the year.

OPINION.

GREEN: The Standard Refractories Co. contends that it is entitled to a deduction under the provisions of section 234 (a) (8) of the Revenue Act of 1918, which provides for the deduction of a reasonable allowance for the amortization of facilities constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to prosecution of war against the German government. The Commissioner bases the disallowance of this deduction upon three grounds;

(1) The petitioner was not actively engaged in the manufacture of articles which contributed directly to the prosecution of the war.

(2) Facilities which the petitioner ordered or contracted for, or for which it made definite commitments, prior to April 6, 1917, though actually constructed, erected, installed, or acquired, on or after that date, and used for the production of articles contributing to the prosecution of the war, are not facilities acquired for the production of articles contributing to the prosecution of the war within the meaning of the provisions of section 234 (a) (8) of the Revenue Act of 1918.

(3) Facilities for which there may not have been any definite commitments prior to April 6, 1917, but which were acquired in pursuance of a plan of expansion determined and entered upon prior to that date, are not facilities acquired for the production of articles contributing to the prosecution of the war within the meaning of the provisions of section 234 (a) (8) of the Revenue Act of 1918.

Section 234 (a) (8) of the Revenue Act of 1918 reads as follows:

(8) In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, and in the case of vessels constructed or acquired on or after such date for the transportation of articles or men contributing to the prosecution of the present war, there shall be allowed a reasonable deduction for the amortiza-

tion of such part of the cost of such facilities or vessels as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title or previous Acts of Congress as a deduction in computing net income. At any time within three years after the termination of the present war the Commissioner may, and at the request of the taxpayer shall, reexamine the return, and if he then finds as a result of an appraisal or from other evidence that the deduction originally allowed was incorrect, the taxes imposed by this title and by Title III for the year or years affected shall be redetermined and the amount of tax due upon such redetermination, if any, shall be paid upon notice and demand by the collector, or the amount of tax overpaid, if any, shall be credited or refunded to the taxpayer in accordance with the provisions of section 252.

The Commissioner at the hearing did not seriously contend that the petitioner was not actively engaged in the manufacture of articles which contributed directly to the prosecution of the war. The evidence upon this point is so clear and convincing that we have not thought it necessary to set it forth in detail in our findings of fact, and we are convinced that the petitioner was entirely engaged in the manufacture of articles contributing directly to the prosecution of the war. Since the petitioner was so engaged, we must hold that it is entitled to a reasonable allowance for the amortization of such facilities as it constructed, erected, installed, or acquired after April 6, 1917, for the production of silica brick, which were articles contributing to the prosecution of the war.

The right of a taxpayer to an amortization deduction with respect to facilities constructed, erected, installed, or acquired, on or after April 6, 1917, though ordered or contracted for prior to that date, and the right to the same deduction with respect to facilities acquired on or after such date pursuant to a plan of expansion determined upon and entered into prior to that date, has heretofore been considered by the Board. Both of these questions were decided in the *Appeal of Manville Jenckes Co.*, 4 B. T. A. 765. The arguments and contentions advanced by the Commissioner in this case are identical with those advanced by him in the *Manville Jenckes* case, and, in accordance with our decision in that case, we hold that the petitioner herein is entitled to an amortization deduction upon facilities acquired on or after April 6, 1917, for the production of articles contributing to the prosecution of the war, notwithstanding the fact that some or all of such facilities may have been ordered or contracted for prior to that date, or that some or all of such facilities may have been acquired pursuant to a plan of expansion determined upon and entered into prior to such date.

Section 234 (a) (8) of the Revenue Act of 1918 provides "that there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vessels as has been borne by the taxpayer." Nowhere in the Revenue Act is there any provi-

sion with reference to the method of ascertaining the amount of this deduction. The Commissioner has provided in his regulations as regards property the use of which was not limited to the period of its operation as a war facility, that the deduction shall be the difference between the cost and the value of the property, which value "shall be the estimated value to the taxpayer in terms of its actual use or employment in his going business," with other limitations not here material. By common consent the parties hereto have presented this appeal upon the theory that the amount of the deduction to which the petitioner is entitled shall be determined in the light of the regulation, and neither has contested the correctness of the regulation in so far as it purports to outline the method for ascertaining the amount of the deduction. The disagreement between the parties here is as to the value in use of the amortizable facilities.

In the *Appeal of Banna Manufacturing Co.*, 1 B. T. A. 1037, we said:

Taxpayers who produced articles contributing to the prosecution of the late war and who, on or after April 6, 1917, erected, installed or acquired buildings, machinery, equipment or other facilities for that purpose, are entitled to deduct from gross income, under section 234(a)(8) of the Revenue Act of 1918, the difference between the cost of such buildings, machinery and equipment, and their actual sale price or fair market value when discarded, with proper allowance for depreciation while used, or, if they are still in use, their value to the taxpayer in terms of their use or employment in its going business.

In the *Appeal of the Kirk Coal Co.*, 3 B. T. A. 755, in considering the evidence as to the amount of the deduction to which the taxpayer is entitled, it was said:

That the assets upon which amortization is claimed were employed in the business subsequent to the termination of the amortization period is clear, but no evidence has been presented to show the extent to which they were so employed, or the actual or estimated cost of the replacement of these assets under normal postwar conditions.

In considering a similar question in the *Appeal of the Greenville Coal Co.*, 3 B. T. A. 1323, we said:

Taxpayer claimed amortization on the tenant houses erected by it during the war period. The record discloses the fact that those tenant houses have been used by the taxpayer since the close of the war. Neither the exact amount or comparative value of such use, nor the actual or estimated cost of replacing them under normal postwar conditions, is disclosed. It may be that taxpayer is entitled to some amortization on account of materially diminished useful value, but, because it is disclosed that those houses have been and still are used, it is evident that they did not lose their entire useful value, and there are no facts in the record that will enable the Board to determine to what extent their useful value was impaired. We, therefore approve the determination of the Commissioner on that issue.

Again, in the consideration of a similar question in the *Appeal of Standifer Construction Corporation*, 4 B. T. A. 525, at page 555, we said:

The use to which facilities are put by a taxpayer during the amortization period as compared to the use to which they were put in the postwar period may be taken into consideration in determining the gross amount of the amortization deduction which is to be spread over the different taxable years, * * *.

In the *Appeal of Manville Jenckes Co.*, *supra*, p. 796, the petitioner and the Commissioner were in agreement as to the fundamental proposition " that capacity and production must be considered in some kind of a comparison in arriving at a determination as to the value in use of amortizable facilities."

In this appeal the Commissioner does not agree that the deduction is to be measured by the postwar production and its relation to the prewar production, and we are thus called upon to determine whether the evidence adduced by the petitioner herein as to its production of brick before, during, or after the war, may be used as the measure of the value in use of the amortizable facilities and the amount of the deduction ascertained thereby. It should be noted that, while there was some testimony as to the extent to which the facilities were used after they were acquired by the General Refractories Co. following its acquisition thereof and the dissolution of the petitioner, such testimony is of little value and that, so far as the petitioner is concerned, the only evidence introduced by it bearing upon the value in use of its amortizable facilities in its normal postwar business, is that relating to the physical use of the facilities during the postwar period prior to October, 1922, that being the time when its capital stock was sold to the stockholders of the General Refractories Co.

The petitioner asserts that by this evidence it has established that its production of finished burnt brick during that portion of the postwar period between January 1, 1919, and August 31, 1922, was but 51.74 per cent of its production during the war period commencing April 6, 1917, and ending December 31, 1918, and contends that the value in use of its amortizable facilities is but 51.74 per cent of their original cost and asks us to find that it is entitled to an amortization deduction in an amount equal to 48.26 per cent of the cost of these facilities, which cost was $238,305.79. If we assume that the physical use to which the amortizable facilities were put in the normal peace-time business was but 51.74 per cent of their use during the war period, it does not necessarily follow that the value of these facilities to the petitioner is but 51.74 per cent of their original cost. Undoubtedly this is a factor which should be considered in determining what amount should be allowed as a

reasonable deduction for amortization, but at best it is but one of the several factors. The cost of replacement, during the postwar period, of the same or other facilities which would produce the same results; any improvements or radical changes in the facilities; the salvage value of such facilities; their selling price if they have been sold; a proper discount for excess facilities which may be used because they are on hand but which in the ordinary conduct of the business would have been acquired only in the future; and all other similar factors, depending upon the facts in the particular case, must be considered in determining the amount of the deduction.

The evidence discloses that the General Refractories Co., in October, 1922, acquired all of the petitioner's outstanding capital stock; that shortly thereafter it took over all of the petitioner's assets including such of the amortizable facilities as remained on hand, and that the petitioner corporation was then dissolved. The evidence does not disclose the purchase price paid for the stock, and it is contended that this fact is not material and that it has no bearing upon the value of the petitioner's assets at the time of the transaction. It seems to us that such facts are material and that, had we been advised of the price paid for this stock and of other factors bearing upon the value of the petitioner's assets, we would have had facts which would have aided materially in the determination of the amount of the deduction. We are constrained to hold that the value in use of the petitioner's amortizable facilities can not be measured or determined solely on the basis of postwar physical use; that the evidence here adduced is not sufficient to enable us to determine the value in use of the amortizable facilities; and that we can not compute or determine the amount of the deduction to which the petitioner is entitled.

Prior to 1919, under an accounting practice consistently adhered to, the petitioner had charged to expense all purchases of spare parts for the repair of the plant equipment. In 1919 a change in the method of accounting for supplies of this nature was adopted, which contemplated that purchases should thereafter be charged to an inventory account and written off to expense only as the supplies were withdrawn from stores and actually used. To correct the accounting records so that they would conform with this new accounting practice, the petitioner inventoried all supplies of this nature on hand at January 31, 1919, all of which had previously been charged to expense, and by journal entry of that date recorded the cost thereof, the sum of $10,576.74, on its books by charges to inventory accounts and a credit to surplus. This item of $10,576.74 was included by the petitioner in net income for the year 1919, but a nota-

tion on the return contained a claim that at least $5,000 of this amount should be exempt from tax at the minimum cost of spare parts which had been purchased in prior years. The Commissioner held that the entire amount of $10,756.74 was income for the year 1919. The issue is not a difficult one and is easily disposed of. Obviously, the petitioner could not realize any income from a mere book entry recording in its accounts the cost of supplies on hand which had been purchased in prior years and charged to expense in those years. The income of the year 1919 was not affected in the least by this entry. Its sole purpose was to bring the books of account into conformity with the new system of accounting for spare parts. No part of the item in question constitutes income for the year 1919.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

MILLIKEN did not participate.